Ernest Sutton BELL, Petitioner–Appellant,

v.

Mack JARVIS; Robert Smith, Respondents–Appellees.

No. 98–7002.

United States Court of Appeals, Fourth Circuit.

Argued May 2, 2000.

Decided Dec. 29, 2000.

**154**

**ARGUED:** James Phillip Griffin, Jr., North Carolina Prisoner Legal Services, Inc., Raleigh, North Carolina, for Appellant. Ellen Bradshaw Scouten, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Kathryn L. VandenBerg, North Carolina Prisoner Legal Services, Inc., Raleigh, North Carolina, for Appellant. Michael F. Easley, Attorney General of North Carolina, North Carolina Department of Justice, Raleigh, North Carolina, for Appellees.

---

Before WILKINSON, Chief Judge, WIDENER, MURNAGHAN,\* WILKINS, NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, MOTZ, TRAXLER, and KING, Circuit Judges, and BUTZNER, Senior Circuit Judge.

Affirmed by published opinion. Judge TRAXLER wrote the majority opinion, in which Chief Judge WILKINSON and Judges WIDENER, WILKINS, NIEMEYER, LUTTIG, WILLIAMS, and KING joined. Judge MOTZ wrote a dissenting opinion, in which Judge MICHAEL joined. Senior Judge BUTZNER wrote a dissenting opinion.

## OPINION

TRAXLER, Circuit Judge:

Ernest Sutton Bell appeals the district court's decision denying his petition for writ of habeas corpus, *see* 28 U.S.C.A. § 2254 (West 1994 & Supp.2000), in which he challenges his convictions in North Carolina state court of multiple counts of sexual misconduct, including rape, committed against his minor step-granddaughter.[1] We affirm.

### I.

In January 1994, Bell was convicted by a jury in North Carolina of fifty-eight counts of sexual misconduct—comprised of eight counts of first degree rape, four counts of first degree sexual offense, nineteen counts of second degree rape, and twenty-seven counts of taking indecent liberties with a minor—all of which involved his step-granddaughter Wendy.[2] The offenses spanned a two-year period, beginning in March 1990, when Wendy was awakened on a Saturday morning by Bell,

---

\* Judge Murnaghan heard oral argument in this case but died prior to the time the decision was filed.

1. Because Bell's petition for writ of habeas corpus was filed after the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, the amendments

to 28 U.S.C.A. § 2254 effected by § 104 of the AEDPA govern the resolution of this appeal. *See Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595, 1602, 146 L.Ed.2d 542 (2000).

2. The record indicates that twenty-seven additional counts were dismissed during the course of the trial.

who proceeded to rape her by vaginal and anal intercourse while she begged him to stop. Afterwards, Bell told Wendy that he would stop loving her if she told anyone what he had done. Wendy was twelve years old and in the sixth grade. Bell was fifty-five years old, a family member and trusted adult figure in Wendy's life, known to her since birth.

The threat was effective. For the next two years, Bell, who lived nearby, sexually molested Wendy by vaginal and anal intercourse, oral sex, and other indecent sexual touchings once or twice each month in his home, while his wife was sleeping or at work, and approximately twice a week at Wendy's home, and in her bed, during her after-school hours. Wendy, too frightened to tell her parents about the abuse, began to withdraw from others and to sleep on the floor instead of in her bed. In addition, Wendy's schoolwork, already made difficult by a learning disability, began to deteriorate.

Evidence at trial revealed that, in addition to Wendy, Bell had sexually molested two other adolescent girls, both of whom lived nearby and were friends of Wendy. The first, Toni, testified that Bell had repeatedly molested her by vaginal and anal intercourse, over the course of approximately one year, and that Bell utilized threats of hurting her sister to keep Toni from telling anyone. Toni also testified that she was present at Bell's home on one occasion when he sexually molested Wendy. Locked outside of the house, Toni testified that she could hear Wendy's screams. Toni was eleven years old when the abuse began.

The third minor, Vicki, testified that while visiting Bell with Wendy in the fall of 1990, Bell touched her breasts, anus, and vagina through her clothing. At the time, Bell's wife was cooking dinner and Vicki, unsure of what had occurred, got up from the floor where she had been playing with a puppy and sat on the couch. The next day, Vicki asked Wendy if Bell had done anything like that to her, prompting

Wendy to confide in her friend. At the time, Vicki was twelve years old. Afterwards, Wendy continued to confide in Vicki about Bell's actions, but Vicki kept silent. She also refused Wendy's requests that Vicki go with her to Bell's home. In May 1992, however, Vicki finally agreed to again accompany Wendy to Bell's home, hoping Bell would leave Wendy alone if Vicki was present. Instead, Bell turned his attention to Vicki. While Bell's wife and Wendy slept, Bell again touched Vicki in the same places, although this time he did so beneath her clothing. Vicki was able to temporarily avoid further assault, first by telling Bell she needed to go to the restroom, and later by the stirrings of Bell's sleeping wife. Undaunted, Bell repeated these actions the following day while swimming with Vicki and Wendy. Like her friends, Vicki continued her silence.

In fact, each of the girls kept quiet until June 1992, when Wendy and Vicki attended a slumber party together and saw a television show about rape and the sexual molestation of children. Vicki told Wendy that she "couldn't take it anymore, [and] was telling [her] parents the next day when [she] got home." J.A. 451. Wendy agreed to do the same. The following afternoon, Wendy told her mother and aunt about Bell's sexual abuse, and law enforcement officers were contacted. Shortly thereafter, Wendy was examined by a pediatrician who found physical evidence consistent with repeated sexual penetration.

The day before Bell's trial began, the state trial judge held a pretrial hearing to address several evidentiary issues, Bell's motion to sequester the minor witnesses, which was granted, and the state's motion to consolidate the charges involving Wendy with those involving Toni and Vicki, which was denied. The state had also moved to close the courtroom during the testimony of each girl, but at least as to Wendy. Bell objected to closure, on Sixth Amendment public trial grounds, but of-

fered no alternative to the temporary closure request proposed by the state. The trial judge, noting that the testimony would be "of an apparent delicate nature," agreed that a temporary closure would be appropriate, but ruled that it would be carried out as discreetly as possible so as not to call it to the jury's attention. J.A. 281.

The next day, the courtroom was closed to the public during Wendy's testimony.[3] At a minimum, however, the court reporter, court personnel, the jury, the prosecutor, Bell's attorney, and the family members and friends of the minor witnesses were allowed to remain.[4] Also, the testimony was recorded as was standard, and was available for transcription to the public. Of the 700–plus–page trial transcript, spanning four days, approximately forty-four pages comprised the testimony of Wendy.

At the conclusion of Wendy's testimony, the courtroom was immediately reopened.[5] At that time, the trial judge specifically asked whether Bell wanted his wife to return to the courtroom. Bell's counsel refused, indicating that they did *not* want her to return, after which the trial judge stressed that Bell was entitled to have anyone he wanted in the courtroom with him.[6]

Bell was ultimately convicted by the jury and sentenced to two life terms plus seventy years. On direct appeal, counsel selected four assignments of error to pursue in briefing. The convictions and sentence were affirmed on direct appeal. *See State v. Bell,* 117 N.C.App. 732, 453 S.E.2d 877 (1995) (table).

Bell then filed a motion for appropriate relief ("MAR"), *see* N.C. Gen.Stat. § 15A–1415 (1999), in the Pitt County Superior Court, asserting that he received ineffective assistance of counsel on direct appeal, in violation of his Sixth Amendment right to counsel, because his appellate counsel did not pursue a claim that his Sixth Amendment right to a public trial was violated by the trial judge's closure of the courtroom during Wendy's testimony. The Superior Court denied Bell's MAR, and the North Carolina Court of Appeals

3. Before the jury entered the courtroom, the state informed the judge that Wendy would be the first witness. This resulted in the closure being implemented for a short time before Wendy actually testified—specifically, during the swearing of the jury and the very brief openings, all of which comprised five pages of transcript. By doing so, the trial judge purposely eliminated the need to return the jury to the jury room after openings and served the goal of carrying out the closure as discreetly as possible. Although technically beyond the scope of the original closure order, Bell's trial counsel lodged no objection to the closure being handled in this manner and no appeal is taken in this regard.

4. The state contends that the press was also permitted to stay, but Bell contends that this is unclear. It is indeed unclear. The transcript does not indicate whether the press was present in the courtroom or whether any member of the press wanted to be present. Although there was pre-trial publicity associated with the trial, there is no indication that the press objected to the closure.

5. Although the state originally asked for closure of the courtroom during the testimony of Toni and Vicki, it is also unclear as to whether the courtroom was ever closed again—a fact that the state and Bell do not dispute. Bell's petition for habeas relief complains that "the trial judge closed the courtroom during the complainant's testimony," J.A. 92, and, in any event, if Bell cannot show that the courtroom was closed during the testimony of Toni and Vicki, he obviously cannot show a violation of his right to a public trial on that basis. Accordingly, we limit our discussion to the closure of the courtroom during Wendy's testimony.

6. With the exception of his wife, Bell points to no one who was actually excluded by the trial judge's order. The specific colloquy regarding her return was as follows:

> THE COURT: All right.
> Do you want Mrs. Bell to come in here?
> MR. O'KELLEY: Your Honor, I don't actually. We'll just leave her out of the courtroom, that will be fine.
> THE COURT: Well, you are welcome to have anybody in here you want now.
> MR. O'KELLEY: Yes, sir, I understand.

J.A. 339.

denied his subsequent petition for certiorari.

Bell thereafter filed a petition for writ of habeas corpus, pursuant to 28 U.S.C.A. § 2254, in the federal district court, asserting as the sole claim that his counsel was ineffective for failing to raise the public trial claim on direct appeal. The district court, rejecting the magistrate judge's recommendation that Bell be granted either a new state appeal or trial, dismissed Bell's petition and, pursuant to 28 U.S.C.A. § 2253(c)(2) (West Supp.2000), denied him a certificate of appealability. *See Bell v. Jarvis*, 7 F.Supp.2d 699 (E.D.N.C.1998).

After this court granted Bell a certificate of appealability on the issue of whether he received ineffective assistance of counsel on direct appeal, a panel of the court reversed the district court's denial of habeas relief and remanded for the conditional issuance of the writ, holding that the state trial judge's closure of the courtroom violated Bell's Sixth Amendment right to a public trial and that Bell's counsel was constitutionally ineffective for failing to pursue the public trial claim on direct appeal to the North Carolina appellate court. *See Bell v. Jarvis*, 198 F.3d 432 (4th Cir. 1999) (vacated). A majority of the active circuit judges thereafter voted to hear the appeal *en banc*. Because we conclude that the state court's rejection of Bell's MAR was not an unreasonable adjudication of Bell's Sixth Amendment claims, *see* 28 U.S.C.A. § 2254(d), we now affirm the district court's decision to deny Bell's habeas petition.

## II.

### A.

■ We begin our analysis with the recognition, recently highlighted by the United States Supreme Court, that we may not review Bell's Sixth Amendment claims *de novo*. Rather, because Bell's ineffective assistance of counsel claim was adjudicated on the merits by the North Carolina state court, our review is limited by the deferential standard of review set forth in § 2254(d), as interpreted by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1518–23, 146 L.Ed.2d 389 (2000): We may not grant federal habeas relief unless we conclude that North Carolina's adjudication of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1); *see Williams*, 120 S.Ct. at 1518.

■ In *Williams*, the Supreme Court held that a state court decision is "contrary to ... clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts," *Williams*, 120 S.Ct. at 1523. In such cases, "a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's 'contrary to' clause." *Id.* at 1520. The Court also upheld the principle that a state court decision "involve[s] an unreasonable application of[ ] clearly established Federal law, as determined by the Supreme Court," 28 U.S.C.A. § 2254(d)(1), when the state court "identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 120 S.Ct. at 1523. However, the Court left open the question of whether a decision represents an unreasonable application of precedent if the state court decision "unreasonably extend[s] a legal principle from our precedent to a new context where it should not apply (or unreasonably refuse[s] to extend a legal principle to a new context where it should apply)." *Id.* at 1521; *see Green v. French*, 143 F.3d 865, 869–70 (4th Cir.1998), *cert. denied*, 525 U.S. 1090, 119 S.Ct. 844, 142 L.Ed.2d 698 (1999). Instead, the Court held that "[f]or

now it is sufficient to hold that when a state-court decision unreasonably applies the law of th[e] Court to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's 'unreasonable application' clause," *id.* at 1521. Finally, the Court made it clear that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 1522 (emphasis added). Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be [objectively] unreasonable." *Id.*

■■■ In this case, the North Carolina state court did not articulate the rationale underlying its rejection of Bell's Sixth Amendment claim. However, we may not "presume that [the] summary order is indicative of a cursory or haphazard review of [the] petitioner's claims." *Wright v. Angelone,* 151 F.3d 151, 157 (4th Cir.1998). Rather, the state court decision is no less an "adjudication" of the merits of the claim and must be reviewed under the deferential provisions of § 2254(d)(1). *See id.* at 156–57. In such cases, we conduct an independent examination of the record and the clearly established Supreme Court law, *see Bacon v. Lee,* 225 F.3d 470, 478 (4th Cir.2000); *Baker v. Corcoran,* 220 F.3d 276, 291–92 n. 14 (4th Cir.2000), but we must still "confine our review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' " *Bacon,* 225 F.3d at 478 (quoting 28 U.S.C.A. § 2254(d)(1)).

## B.

Our colleagues in dissent take issue with this standard of review, asserting that we should also require federal habeas courts

to " 'independently ascertain whether the record reveals a violation' of [the petitioner's] constitutional rights—*i.e.,* whether the state court erred in denying the writ"—before turning to the § 2254(d) question of whether the state court determination resulted in a decision that was contrary to, or involved an unreasonable application of, the applicable law. *Infra* at 176–77. We disagree.

### 1.

In support of the argument that federal habeas courts must render an independent determination of whether the state court, in its judgment, "erred in denying the writ," the dissent relies primarily upon our decision in *Cardwell v. Greene,* 152 F.3d 331 (4th Cir.1998). In *Cardwell,* a panel of this court held that the failure of a state court to articulate any rationale for its adverse determination of a constitutional claim renders a "review [of] that court's 'application of clearly established Federal law' " impossible and necessitates that federal habeas courts "independently ascertain whether the record reveals a violation of" the petitioner's constitutional rights. *Id.* at 339. Under these circumstances, the court held, "the distinction between *de novo* review and reasonableness review becomes insignificant." *Id.* (internal quotation marks and alterations omitted).

### a.

As an initial premise, we note that *Cardwell* does not require federal habeas courts to independently ascertain whether a prisoner's constitutional rights have been violated as an interim step to a "reasonableness" determination, as the dissent would now have us interpret it. Rather, it effectively accords no deference to state court decisions unaccompanied by articulated reasons, and nowhere is this more evident than in its explicit statement that in such cases there is no difference of significance between the pre-AEDPA de novo review and the reasonableness review called for by the AEDPA amendments. *See e.g.,*

*Aycox v. Lytle,* 196 F.3d 1174, 1177–78 (10th Cir.1999) (noting conflict between those circuits which "look to the state court's result and defer to it even where analysis is lacking" and *Cardwell*'s requirement that federal habeas courts reviewing a summary state court decision "independently ascertain whether the record reveals a violation of" the petitioner's constitutional rights).

When issued, *Cardwell* was inconsistent with our prior opinion in *Wright,* in which we had declined to review summary state court adjudications de novo. *See Wright,* 151 F.3d at 156–57. In *Wright,* we held that the criterion of a reasonable determination for purposes of § 2254(d) is not "whether [the state court decision] is well reasoned," but "whether the determination is at least minimally consistent with the facts and circumstances of the case." *Id.* at 157 (quoting *Hennon v. Cooper,* 109 F.3d 330, 335 (7th Cir.1997)). Thus, while we noted that "a detailed state court order is more likely to withstand federal judicial scrutiny," *id.* at 157, we, too, declined to interpret the term "unreasonable" in § 2254(d) "as having reference to the quality of the reasoning process articulated by the state court in arriving at the determination," *Hennon,* 109 F.3d at 334. Such an interpretation, as recognized by the court in *Hennon* "would place the federal court in just the kind of tutelary relation to the state courts that the recent amendments [were] designed to end." *Id.* at 335; *see also Aycox,* 196 F.3d at 1178 n. 3 (although "[a] state court's explanation of its reasoning would avoid the risk that we might misconstrue the basis for the determination, and consequently diminish the risk that we might conclude the action unreasonable at law or under the facts at hand, ... when presented with a summary disposition, ... we will do our best under the standard of review mandated by the AEDPA.")

Without mention of the decision in *Wright,* the *Cardwell* court improperly equated the "reasonableness" inquiry of § 2254(d) with "the quality of the reasoning process articulated by the state court in arriving at the determination," *Hennon,* 109 F.3d at 334, thereby adopting the precise approach we had just rejected. *See Jones v. Angelone,* 94 F.3d 900, 905 (4th Cir.1996) (noting that a panel of this court cannot "overrule the decision of another panel; only the *en banc* court may overrule a prior panel decision"). The *Cardwell* decision is now also inconsistent with the Supreme Court's recent interpretation of the standard of review called for by the AEDPA amendments to § 2254(d)(1).

b.

Prior to the enactment of the AEDPA amendments, federal courts were required to exercise independent judgment when entertaining a state prisoner's application for habeas relief. *See Williams,* 120 S.Ct. at 1516 (O'Connor, J., concurring). "In other words, a federal habeas court owed no deference to a state court's resolution" of "questions of constitutional law [or] mixed constitutional questions (*i.e.,* application of constitutional law to fact)," *id.,* and precedent "dictated that a federal court should grant a state prisoner's petition for habeas relief if that court were to conclude in its independent judgment that the relevant state court had erred," *id.* at 1517.

In *Williams,* however, the Supreme Court expressly rejected the view that " § 2254(d)(1) does not alter th[is] previously settled rule of independent review," as well as the notion that if a federal court, after "carefully weighing all the reasons for accepting a state court's judgment, ... remains convinced that a prisoner's custody violates the Constitution, that independent judgment should prevail." *Id.* at 1518 (internal quotation marks omitted). Such an interpretation, the Court held, "gives the 1996 amendment no effect whatsoever," *id.,* and "avoid[s] confronting the specific meaning of the statute's 'unreasonable application' clause and its ramifica-

tions for the independent-review rule," *id.* at 1519.

◼ Accordingly, since our decision in *Cardwell,* the Supreme Court has made it clear that de novo, independent, or plenary review of state court adjudications is no longer appropriate, that there are indeed important distinctions between the "reasonableness" review called for by the AEDPA and the de novo review of the past, and that a writ of habeas corpus may no longer issue simply because a federal habeas "court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 1522. Despite attempts to characterize it otherwise,[7] the decision in *Cardwell* plainly calls for just such a review when the state court decision fails to articulate the rationale behind its denial of a claim. It requires federal habeas courts to "independently ascertain whether the record reveals a violation" of the petitioner's constitutional rights, *Cardwell,* 152 F.3d at 339, and thereby pass judgment on whether the state court has erred. Accordingly, to the extent that *Cardwell* requires federal habeas courts to conduct a de novo or effectively de novo review of a summary state court adjudication, or to grant habeas relief based upon an independent determination that the state court has violated the constitutional rights of the petitioner, it must be overruled.

### 2.

*Cardwell* aside, we turn to the question of whether there are other persuasive reasons for requiring federal habeas courts,

as an essential part of the § 2254(d) inquiry, to independently ascertain whether the state court has "erred" before turning to the question of whether the state court decision is contrary to or involves an unreasonable application of the controlling Supreme Court precedents. We find none.

◼ First and foremost, the language of § 2254(d) does not support such a requirement. Section 2254(d) requires federal habeas courts to ascertain whether the underlying state court adjudication of a claim on the merits *"resulted in a decision* that was contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent. 28 U.S.C.A. § 2254(d)(1) (emphasis added). It does not require that a state court cite to federal law in order for a federal court to determine whether the state court decision is an objectively reasonable one, nor does it require a federal habeas court to offer an independent opinion as to whether it believes, based upon its own reading of the controlling Supreme Court precedents, that the defendant's constitutional rights were violated during the state court proceedings. The recent Supreme Court decision in *Williams* also counsels against imposing an inflexible requirement upon a federal habeas court to independently ascertain whether it would find a constitutional violation were it presented with an identical factual situation. Such a determination fulfills no statutory duty and runs contrary to the spirit of § 2254(d)(1), for a writ of habeas corpus may no longer be issued simply because a federal court concludes in its independent judgment that

---

7. *See Barnabei v. Angelone,* 214 F.3d 463, 469 (4th Cir.), *cert. denied* — U.S. —, 121 S.Ct. 24, 147 L.Ed.2d 1047 (2000) (recognizing that "de novo review by a federal habeas court [is] inappropriate under § 2254(d)," but that *Cardwell* nonetheless requires federal habeas courts reviewing summary state court decisions to " 'independently ascertain whether the record reveals a violation' " of the petitioner's constitutional rights); *Green v. Catoe,* 220 F.3d 220, 223 (4th Cir.2000) (noting that although a "perfunctory rejection" of peti-

tioner's constitutional claim is an "adjudication" for purposes of § 2254(d), we must nonetheless "review th[e] claims under the *Cardwell* standard" of review which considers *"the distinction between de novo review and 'reasonableness' review [to be] insignificant "*) (emphasis in original); *Goins v. Angelone,* 226 F.3d 312, 326 (4th Cir.2000) (holding that because the state court "decided the[ ] claims without written analysis, the distinction between section 2254(d) 'reasonableness' review and de novo review becomes insignificant").

the state court erred. *See Williams,* 120 S.Ct. at 1521–22.[8]

Nor are we presented with other persuasive reasons or purposes, not expressed in the statute, which would support our imposing upon ourselves and our district courts a "methodology" of review in § 2254(d) cases that requires a determination of whether the state court has "erred" before a determination of whether the state court result is unreasonable in light of clearly established Supreme Court precedents. *Cardwell* provides no insight into the question of why we should require federal habeas courts to conduct a de novo review prior to conducting a reasonableness review of the constitutional questions before it, most likely because it did not purport to require the independent determination as an interim step towards determining reasonableness.

Thus, we appear to be left with the dissent's reliance upon *Van Tran v. Lind-* *sey,* 212 F.3d 1143, 1154–55 (9th Cir.), *cert. denied,* —— U.S. ——, 121 S.Ct. 340, 148 L.Ed.2d 274 (2000), in which the Ninth Circuit imposed, in all cases, this nonstatutory requirement of determining whether the state court "erred" before turning to inquiry necessitated by the AEDPA. "Requiring federal courts to first determine whether the state court's decision was erroneous, prior to considering whether it was contrary to or involved an unreasonable application of controlling law under AEDPA," the court held, "promotes clarity in our own constitutional jurisprudence and also provides guidance for state courts, which can look to our decisions for their persuasive value." *Id.* at 1155. To the extent these rationales are offered by the dissent in support of its view that we should likewise adopt this proposed methodology, at least in cases involving summary state court adjudica-

---

**8.** The dissent points to the Supreme Court's decisions in *Weeks v. Angelone,* 528 U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000) and *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) as indicators that the Court would impose such an "independent determination" requirement. We simply do not find these inferences appropriate.

The *Weeks* Court affirmed our denial of habeas relief, concluding that the petitioner had not demonstrated a constitutional violation under clearly established Supreme Court precedents and "a fortiori[,] that the adjudication of the Supreme Court of Virginia affirming petitioner's conviction and sentence was neither 'contrary to,' nor did it involve an 'unreasonable application of,' any of our decisions." *Id.* at 734. The dissent claims that, because the Supreme Court rendered an independent decision on the merits based upon its own precedents in a case involving a summary state court disposition, we should presume that the Court would require lower federal courts to do so as well. However, we could just as easily imply the opposite conclusion. Despite our explicit reference to the summary nature of the state court disposition, *see Weeks v. Angelone,* 176 F.3d 249 (4th Cir. 1999) (reiterating *Wright*'s holding that "[a] state court's perfunctory decision is reasonable if it 'is at least minimally consistent with the facts and circumstances of the case' "), the Supreme Court made no mention of the summary nature of the state court's adjudication below, gave no indication that the standard of review required by § 2254(d) was to be altered by how extensively the state court has articulated the underlying basis for its determination, and could have—but did not—impose such a methodology of review upon itself or the lower federal courts.

The dissent's reliance upon *Wilson v. Layne* is equally unpersuasive. In *Wilson,* the Court clarified that federal courts addressing claims under 42 U.S.C.A. § 1983 (West Supp.1998) must decide whether the plaintiff's constitutional rights were violated before turning to the question of whether the state official charged with violating the plaintiff's rights is entitled to qualified immunity because the constitutional right was not clearly established at the time of the alleged violation. *See id.* at 609, 119 S.Ct. 1692. This order of procedure, the Court held, "promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Id.* However, unlike in the doctrinally distinct area of qualified immunity, our decisions in federal habeas cases do not create "clearly established" law for state courts deciding future habeas cases. Only the Supreme Court can create "clearly established" law for purposes of § 2254(d)(1). *See Williams,* 120 S.Ct. at 1523 (holding that § 2254(d) explicitly "restricts the source of clearly established law to [the Supreme] Court's jurisprudence").

**162**

tions, we are unpersuaded.[9]

 By amending § 2254(d), Congress prohibited federal courts from granting habeas relief to a state court defendant unless the state court adjudication resulted in a decision that was contrary to or involved an unreasonable application of Supreme Court precedents, thereby explicitly "restrict[ing] the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 120 S.Ct. at 1523; *see also Harris v. Stovall*, 212 F.3d 940, 944 (6th Cir.2000) (The "clearly established" provision of the AEDPA "marks a 'significant change' and prevents the district court from looking to lower federal court decisions in determining whether the state court decision is contrary to, or an unreasonable application of, clearly established federal law."). Because a federal court may now grant habeas relief only if it determines that the state court decision is contrary to, or an unreasonable applica-

tion of Supreme Court jurisprudence, and not circuit court precedent, any independent opinions we offer on the merits of the constitutional claims will have no determinative effect in the case before us, nor any precedential effect for state courts in future cases. At best, it constitutes a body of constitutional dicta.

 Nor is there a persuasive need to *require* federal habeas courts to offer opinions on significant constitutional questions simply in the interest of providing "guidance" to the state courts within our circuits. We have no reason to presume that state courts are in need of our guidance in interpreting and applying the controlling Supreme Court precedents. Our charge under the statute is only to determine whether the state court's adjudication of the claims before it was a reasonable one in light of the controlling Supreme Court law.[10]

9. Although the dissent does not explicitly advocate that we require federal courts to pass judgment on whether the state court has erred in cases where the state court *has* articulated its rationale, the *Van Tran* court has required this predecessor determination in *all* cases. The requirement, it seems, stems from the court's decision to equate an "unreasonable" state court decision for purposes of § 2254(d) with one which is "clearly erroneous." *See id.* at 1153–54. So long as the court is "left with a 'definite and firm conviction' that an error has been committed," *id.* at 1153, the application will be considered "unreasonable" under § 2254(d)(1) and the writ will issue, *see id.* at 1153–54. This circuit has not equated the "unreasonable" standard of § 2254(d) with a "clearly erroneous" standard; nor did the Supreme Court in *Williams*, although the Court did make it clear that an erroneous or incorrect decision is not the equivalent of an unreasonable one and seemed to reject the "firmly convinced" line of reasoning. *Williams*, 120 S.Ct. at 1518 (rejecting notion that if a federal court, after "carefully weighing all the reasons for accepting a state court's judgment, ... remains convinced that a prisoner's custody violates the Constitution, that independent judgment should prevail.") (internal quotation marks omitted); *see also Francis v. Stone*, 221 F.3d 100, 110 (2d Cir.2000) (noting that *Van Tran's* "approach ... focuses on how sure the habeas court is that the state court has committed

error, not whether the state court decision reveals an increment of wrongness beyond error"); *Hennon*, 109 F.3d at 334 ("[T]he statute commands deference to the state court's judgment by using the word 'unreasonable,' which is stronger than 'erroneous' and maybe stronger than 'clearly erroneous.'") In any event, we to have not been asked to adopt the "clearly erroneous" standard as the standard for reasonableness under § 2254(d), and we decline do so today.

10. On at least one occasion, a panel of this court has indicated that in cases where we might reach a contrary conclusion on a "close" issue, the state court adjudication is not unreasonable. *See Tucker v. Catoe*, 221 F.3d 600, 614 (4th Cir.2000). Today, we hold that a federal court conclusion that a state court has "erred" in its opinion on a "close" case is not required. A federal habeas court may determine that the issue is "close," and therefore not unreasonable, without rendering an opinion as to whether it would reach the same conclusion if presented with the identical issue on direct appeal or by way of a § 2255 application. *See e.g., Vick v. Williams*, 233 F.3d 213, 220 (4th Cir.2000) (noting "that a state court's decision may be objectively reasonable even where ... a federal court deciding the issue on direct appeal would come to a different conclusion."); *Sanders v. Easley*, 230 F.3d 679, 686–87 (4th Cir.2000) (noting that the question is not whether the

### 3.

 We have consistently held that a summary state court decision on the merits of a federal constitutional claim is an "adjudication" of the claim for purposes of § 2254(d), and we reaffirm that holding today. *See Bacon,* 225 F.3d at 478; *Baker,* 220 F.3d at 291 n. 14. *Wright,* 151 F.3d at 156–57; *Cardwell,* 152 F.3d at 339. When the state court fails to articulate the rationale behind its ruling, we must independently review the record and the applicable law. *See Bacon,* 225 F.3d at 478; *Baker,* 220 F.3d at 291 n. 14. However, this independent review of the record and applicable law must be distinguished from a de novo review of the petitioner's claims and from a requirement that we make an independent determination on the merits of those claims. *See, e.g., Aycox,* 196 F.3d at 1178. It does not render the difference between de novo review and reasonableness review insignificant or equate to a requirement that the federal court independently ascertain whether, in its judgment, there has been a violation of the petitioner's constitutional rights prior to determining whether the state court's decision was reasonable. Rather,

> we must uphold the state court's summary decision unless our independent review of the record and pertinent federal law persuades us that its result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented.... Our review is in fact def-

erential because we cannot grant relief unless the state court's *result* is legally or factually unreasonable.

*Id.* (emphasis added); *see also Harris,* 212 F.3d at 943 n. 1 ("Where a state court decides a constitutional issue by form order or without extended discussion, a habeas court should then focus on the *result* of the state court's decision, applying the standard articulated" by the AEDPA) (emphasis added).

In summary, we have not "independently ascertained" whether Bell's Sixth Amendment rights were violated during the state court proceedings or rendered an "independent determination" as to whether we would find a constitutional violation if we were presented with this identical factual scenario in the context of either a criminal trial held at the federal district court level or a motion brought under 28 U.S.C.A. § 2255 (West Supp.2000). We have not done so because it is not an essential part of the inquiry under § 2254(d). Thus, our choice cannot be construed, as our colleagues suggest, as "implicit recognition that counsel's failure to appeal the blatant public trial violation clearly violated federal law," *infra* at 183–84, but may acceptably be interpreted as explicit recognition that we accord to state judiciaries the deference called for by § 2254(d) and that we are, by virtue of Congress' amendments to § 2254(d), no longer permitted to review de novo their decisions on the merits.

state court has erred in our view, but whether the decision of the state court was contrary to or involved an unreasonable application of Supreme Court law). Indeed, this represents the spirit of § 2254(d)(1)'s deference to state court decisions on federal constitutional claims.

This does not mean, however, that it is unacceptable for a federal habeas court to conclude that the state court decision was correct and, therefore, not an unreasonable application of Supreme Court precedent. Clearly, it is acceptable to do so. *See e.g., Weeks v. Angelone,* 176 F.3d 249 (4th Cir. 1999), *aff'd,* 528 U.S. 225, 120 S.Ct. 727, 145

L.Ed.2d 727 (2000); *McCarver v. Lee,* 221 F.3d 583, 594 n. 6 (4th Cir.2000). We simply decline to dictate to federal habeas courts any strict methodology by which they are to arrive at the ultimate, statutorily mandated determination of whether the state court adjudication has resulted in a decision that is contrary to, or which involves an unreasonable application of, clearly established *Supreme Court* law. *See Francis,* 221 F.3d at 110 (noting that in the wake of the Supreme Court's decision in *Williams,* the courts have applied the "unreasonable application" phrase of § 2254(d) in varied ways).

## C.

With these standards in mind, we turn now to identify the clearly established federal law, as determined by the Supreme Court, which governs Bell's claim that his Sixth Amendment right to effective assistance of counsel was violated by his counsel's failure to pursue, on direct appeal, a claim that his Sixth Amendment right to a public trial `was violated when the trial judge temporarily closed the courtroom while Wendy related the details of Bell's sexual attacks upon her.

### 1.

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. In addition, case law requires that to satisfy the right, the assistance must be effective. *See Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This right to effective assistance of counsel extends to require such assistance on direct appeal of a criminal conviction. *See Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

In order to establish a claim that appellate counsel was ineffective for failing to pursue a claim on direct appeal, the applicant must normally demonstrate (1) that his "counsel's representation fell below an objective standard of reasonableness" in light of the prevailing professional norms, *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. *See Smith v. Robbins,* 528 U.S. 259, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000) (holding that habeas applicant must demonstrate that "counsel was objectively unreasonable" in failing to file a merits brief addressing a nonfrivolous issue and that there is "a reasonable probability that, but for his counsel's un-

reasonable failure ... , he would have prevailed on his appeal").

In applying this test to claims of ineffective assistance of counsel on appeal, however, reviewing courts must accord appellate counsel the "presumption that he decided which issues were most likely to afford relief on appeal." *Pruett v. Thompson,* 996 F.2d 1560, 1568 (4th Cir. 1993). Counsel is not obligated to assert all nonfrivolous issues on appeal, as "[t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review." *Jones v. Barnes,* 463 U.S. 745, 752, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *see also Smith v. South Carolina,* 882 F.2d 895, 899 (4th Cir.1989). Indeed, " '[w]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (quoting *Jones,* 463 U.S. at 751, 103 S.Ct. 3308); *see also Smith,* 882 F.2d at 899 (counsel's failure to raise a weak constitutional claim may constitute an acceptable strategic decision designed "to avoid diverting the appellate court's attention from what [counsel] felt were stronger claims"). Although recognizing that "[n]otwithstanding *Barnes,* it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim" on direct appeal, the Supreme Court has recently reiterated that "it [will be] difficult to demonstrate that counsel was incompetent." *Robbins,* 120 S.Ct. at 765. " 'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.' " *Id.* (quoting *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986)).

### 2.

The Sixth Amendment is also the origin of the accused's "right to a speedy

and public trial." U.S. Const. amend. VI. Finding its roots in English common law, "the guarantee has always been recognized as a safeguard against any attempt to employ our courts as instruments of persecution." *In re Oliver*, 333 U.S. 257, 270, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (granting habeas relief to accused convicted of contempt of court by a state judge acting as a one-man grand jury in secret session). The origin of "[t]he traditional Anglo American distrust for secret trials has been variously ascribed to the notorious use of this practice by the Spanish Inquisition, to the excesses of the English Court of Star Chamber, and to the French monarchy's abuse of the lettre de cachet." *Id.* at 268–69, 68 S.Ct. 499 (footnotes omitted).

Today, the constitutional right to a public trial remains grounded in the belief that " 'judges, lawyers, witnesses, and jurors will perform their respective functions more responsibly in an open court than in secret proceedings,' " *Waller v. Georgia*, 467 U.S. 39, 46 n. 4, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (quoting *Estes v. Texas*, 381 U.S. 532, 588, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Harlan, J., concurring)), and that " 'contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power,' " *id.* (quoting *In re Oliver*, 333 U.S. at 270, 68 S.Ct. 499). "The central aim of a criminal proceeding [is] to try the accused fairly" and the public trial guarantee serves the purpose of "ensuring that judge and prosecutor carry out their duties responsibly ..., encourag[ing] witnesses to come forward[,] and discourag[ing] perjury." *Id.* at 46, 104 S.Ct. 2210. Hence, "[t]he right to a public trial is not only to protect the accused but to protect as much the public's right to know what goes on when men's lives and liberty are at stake, for a secret trial can result in favor to as well as unjust prosecution of a defendant." *Lewis v. Peyton*, 352 F.2d 791, 792 (4th Cir.1965) (granting habeas relief based upon the denial of the accused's right to a public trial in a rape case where

the accused waived his right to a jury trial, the judge heard all testimony at the home and in the bedroom of the eighty-seven-year-old bedridden prosecutrix, and even the neighbors were told to leave the bedroom to make room for the court personnel); *see also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (holding that, under the First Amendment, the trial of a criminal defendant must ordinarily be open to the public and press). The violation of the constitutional right to a public trial is a structural error, not subject to harmless error analysis. *See Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *Waller*, 467 U.S. at 49–50, n. 9, 104 S.Ct. 2210; *Sherman v. Smith*, 89 F.3d 1134, 1138 (4th Cir.1996); *see also McGurk v. Stenberg*, 163 F.3d 470, 473 (8th Cir.1998) (noting that the prejudice component of the *Strickland* analysis may be presumed if the nature of the deficient performance is that of a structural error).

In light of these general principles, the Supreme Court has recognized that there is a presumption in favor of open trials. *See Waller*, 467 U.S. at 45, 104 S.Ct. 2210; *Richmond Newspapers*, 448 U.S. at 573, 100 S.Ct. 2814. Yet the right is not absolute, and the Supreme Court has long recognized that trial judges have discretion to impose reasonable limitations on access to a trial when overriding interests, "such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information," are likely to go unprotected if closure is not employed. *Waller*, 467 U.S. at 45, 104 S.Ct. 2210; *see also Bell v. Evatt*, 72 F.3d 421, 433 (4th Cir.1995) ("Although there is a strong presumption in favor of openness, the right to an open trial is not absolute. The trial judge may impose reasonable limitations on access to a trial in the interest of the fair administration of justice.").

Examined in the context of a First Amendment challenge by the press

to a courtroom closure, the Court first recognized "that the press and public have a qualified First Amendment right to attend a criminal trial." *Waller*, 467 U.S. at 44, 104 S.Ct. 2210. Specifically, the Court held that:

> [t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*"Press–Enterprise I"*). Applying these same principles in the context of a defendant's Sixth Amendment challenge to the complete closure of a courtroom proceeding, the Supreme Court likewise held that the right to a public trial may give way if:

(1) the party seeking to close the hearing advances an overriding interest that is likely to be prejudiced,

(2) the closure is no broader than necessary to protect that interest,

(3) reasonable alternatives to closing the proceeding are considered by the trial court, and

(4) findings adequate to support the closure are made by the trial court.

*See Waller*, 467 U.S. at 48, 104 S.Ct. 2210.

### D.

■ In this case, the North Carolina court rejected Bell's claim that his appellate counsel was ineffective for failing to pursue a claim that his public trial right was violated by the temporary closure of the courtroom during Wendy's testimony. The magistrate judge and district judge, in reviewing Bell's habeas petition, focused on the public trial claim, agreeing that the temporary closure complied with *Waller*'s first three requirements, but disagreeing on the adequacy of the trial judge's find-

ings, *i.e.*, whether there were " 'findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " *Id.* at 45, 104 S.Ct. 2210 (quoting *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. 819). Ultimately, the district judge rejected the claim that a reasonably competent attorney would have raised the public trial issue and conversely concluded that "a competent attorney likely would have recognized the futility of such an argument considering the factual circumstances present in this case." *Bell*, 7 F.Supp.2d at 704–05.

■ In this appeal, we too must review *Waller*'s requirements for courtroom closures, but in doing so remain always mindful of the limited nature of our inquiry. Both the state court's determination of whether Bell's appellate counsel's performance fell below an acceptable level, *see Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, and our review of the state court's determination for reasonableness, *see* 28 U.S.C.A. § 2254(d), require an inquiry into the strength of the underlying, defaulted public trial claim. However, the ultimate success of the underlying public trial claim was not determinative before the reviewing court, in this case the North Carolina appellate court, which need "only [have] determine[d] whether [counsel] made a *reasonable* decision in refusing to raise the claim." *Smith*, 882 F.2d at 898–99 (emphasis added). And, this court does not review Bell's ineffective assistance of counsel claim under *Strickland* or his underlying public trial claim under *Waller* on a *de novo* basis. We reiterate that we may not grant habeas relief even if we were inclined to decide those issues differently than the North Carolina courts. *See Williams*, 120 S.Ct. at 1522. Rather, in order to obtain federal habeas relief, Bell must demonstrate that North Carolina's rejection of his ineffective assistance of counsel claim in state post-conviction proceedings involved an *"unreasonable,"* and not just an "erroneous[ ] or incorrect[ ]" application of such precedent. *Id.*

### III.

### A.

 Turning now to the requirements for courtroom closure articulated by the Supreme Court in *Waller*, we begin with the question of whether the state advanced an overriding interest justifying a temporary closure of the courtroom in this case. The interest, of course, was the protection of Wendy while she related the details of the repeated sexual abuse she sustained at the hands of Bell. We have no difficulty in determining that the state advanced a compelling interest in closing the courtroom while Wendy testified and that neither the state court nor counsel for Bell was unreasonable in failing to conclude otherwise.

It has long been recognized that, "[s]hort of homicide, [rape] is the 'ultimate violation of self.' " *Coker v. Georgia*, 433 U.S. 584, 597, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). Indeed, few would question the Supreme Court's recognition of the "highly reprehensible" nature of this type of crime, "both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim and for the latter's privilege of choosing those with whom intimate relationships are to be established." *Id.* Thus, the practice of closing courtrooms to members of the public while a victim of sex crimes testifies has not been uncommon. *See United States ex rel. Latimore v. Sielaff*, 561 F.2d 691, 694 (7th Cir.1977) (noting that "exclusion of spectators during the testimony of an alleged rape victim 'is a frequent and accepted practice when the lurid details of such a crime must be related by a young lady' ") (quoting *Harris v. Stephens*, 361 F.2d 888, 891 (8th Cir.1966)); *see also United States v. Kobli*, 172 F.2d 919, 923 (3d Cir.1949) (noting the common practice of closing the courtroom to members of the public not directly concerned with the trial when "the prosecuting witness is of such tender years as to be seriously embarrassed in giving her testimony by the pres-

ence of spectators not concerned with the trial"). As noted by the Seventh Circuit, the "[p]rimary justification for this practice lies in protection of the personal dignity of the complaining witness." *Latimore*, 561 F.2d at 694.

> Rape constitutes an intrusion upon areas of the victim's life, both physical and psychological, to which our society attaches the deepest sense of privacy. Shame and loss of dignity, however unjustified from a moral standpoint, are natural byproducts of an attempt to recount details of a rape before a curious and disinterested audience. The ordeal of describing an unwanted sexual encounter before persons with no more than a prurient interest in it aggravates the original injury. Mitigation of the ordeal is a justifiable concern of the public and of the trial court.

*Id.* at 694–95.

In support of his claim that the state failed to advance a sufficiently compelling interest in closing the courtroom during Wendy's testimony, Bell relies primarily upon the Supreme Court's decision in *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607–08, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), in which the Court struck down, on First Amendment grounds, a Massachusetts statute that *required* trial judges, without exception, to close the courtroom during the testimony of minor victims of specified sexual offenses. We fail to find sufficient support in *Globe*, however, for Bell's claim that his right to a public trial was violated by the closure of the courtroom during Wendy's testimony.

Although the Court in *Globe* rejected Massachusetts' removal of the trial court's discretion by requiring courtroom closures in all such cases, the Court made clear that "safeguarding the physical and psychological well-being of a minor" victim of sex crimes, including protecting them from further trauma and embarrassment, is precisely the type of compelling interest that can overcome the presumption in favor of

an open trial. *Id.* at 607, 102 S.Ct. 2613. Indeed, the Court took care to explicitly point out the limited nature of its holding:

> We emphasize that our holding is a narrow one: that a rule of *mandatory* closure respecting the testimony of minor sex victims is constitutionally infirm. In individual cases, and under appropriate circumstances, the First Amendment does not necessarily stand as a bar to the exclusion from the courtroom of the press and general public during the testimony of minor sex-offense victims. But a mandatory rule, requiring no particularized determinations in individual cases, is unconstitutional.

*Globe,* 457 U.S. at 611, n. 27, 102 S.Ct. 2613 (emphasis added); *see also Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 9 n. 2, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*"Press–Enterprise II"*) (noting *Globe*'s recognition that "[t]he protection of victims of sex crimes from the trauma and embarrassment of public scrutiny may justify closing certain aspects of a criminal proceeding"). Thus, closing the courtroom in circumstances such as these is indisputably appropriate under Supreme Court jurisprudence, provided the trial judge "determine[s] on a case-by-case basis [that] the State's legitimate concern for the well-being of the minor victim necessitates closure." *Globe,* 457 U.S. at 609, 102 S.Ct. 2613.[11]

Accordingly, we are satisfied that the state demonstrated an over-riding, compelling interest in protecting a child victim from the embarrassment and trauma associated with relating the details of multiple rapes and sexual molestation by a family member, meeting the first *Waller* requirement, and that neither the state court nor Bell's counsel was unreasonable in so concluding. Indeed, if the facts underlying this case are insufficient to establish an overriding interest, we can think of none.

### B.

We are likewise satisfied that it was reasonable to conclude that *Waller*'s second requirement—that the closure be no broader than necessary to protect the compelling interest at stake—was met in this case. Because the compelling interest for closing the courtroom was the protection of Wendy during her testimony, limiting the closure to her testimony was imminently tailored to serve that interest. Additionally, the courtroom was not unnecessarily restricted. Court personnel, the attorneys, and the court reporter remained and, of course, the jury, comprised of the public, was present. The entire proceedings were recorded, the recording was available for transcription to the public, and there is no claim that anything occurred which is not reflected in the transcript. *Cf. Ayala v. Speckard,* 131 F.3d 62, 72 (2d Cir.1997) (*en banc* ) (noting

---

11. We recognize that, while the Supreme Court has never set forth a less rigorous standard for partial closures, some circuits have relaxed the first *Waller* requirement where a temporary or partial closure of a proceeding is at issue. Specifically, these circuits have required only that the state advance a "substantial reason" for closing the proceeding because, unlike those situations involving a complete closure, a partial closure does not threaten as acutely the historical concerns sought to be addressed by the Sixth Amendment. *See e.g., United States v. Osborne,* 68 F.3d 94, 98–99 (5th Cir.1995); *United States v. Farmer,* 32 F.3d 369, 371 (8th Cir.1994); *United States v. Sherlock,* 962 F.2d 1349, 1356–57 (9th Cir.1992); *Nieto v. Sullivan,* 879 F.2d 743, 753 (10th Cir.1989); *Douglas v. Wainwright,* 739 F.2d 531, 532–33 (11th Cir.

1984) (per curiam). Similarly, where a partial closure is involved, courts have " 'look[ed] to the particular circumstances to see if the defendant still received the safeguards of the public trial guarantee.' " *Sherlock,* 962 F.2d at 1357 (quoting *Douglas,* 739 F.2d at 532). However, we need not consider whether *Waller*'s stringent test for complete closures applies equally in the context of a temporary or partial closure, or whether the state could have shown something less than a compelling interest to justify the temporary closure of the courtroom during Wendy's testimony, because we believe it to be settled that the state's interest in protecting minor rape victims is a compelling one. *See Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982).

availability of transcript as a consideration in deciding whether a limited closure designed to protect a single witness during his testimony was violative of the Sixth Amendment right to a public trial), *cert. denied,* 524 U.S. 958, 118 S.Ct. 2380, 141 L.Ed.2d 747 (1998); *Press–Enterprise I,* 464 U.S. at 512, 104 S.Ct. 819 (noting, as a consideration in a First Amendment challenge to the limited closure of jury voir dire, that "the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests").

The limited and temporary nature of the courtroom closure during Bell's trial was fully consistent with protecting Wendy during her testimony. And, we are satisfied that it was reasonable for the state court and Bell's counsel to conclude that the closure was properly limited and narrowly tailored to achieve the intended purpose of protecting this young girl while she was being asked to discuss the details of Bell's repeated sexual assaults upon her.

### C.

Next, *Waller* provides that trial courts are to consider reasonable alternatives to closing the courtroom. We likewise find no deficiency in this regard.

As an initial premise, we think it reasonable to conclude that the limited nature of the closure directed by the trial judge, and his concern that it be carried out in the most discreet way possible, suggests that he considered the situation and determined the most appropriate means to balance the goal of protecting Wendy with Bell's constitutional right to a public trial. The failure of Bell to suggest any alternatives to the temporary, narrowly-tailored closure at issue only bolsters our conclusion.

■ In response to the state's motion for a temporary closure, Bell's counsel objected on the basis of the Sixth Amendment public trial provision, but provided nothing in the way of argument. Once the trial judge determined that the interest in protecting Wendy outweighed Bell's interest in an open courtroom, Bell again proposed no alternative to the limited closure.[12] Under these circumstances, we cannot presume that the trial judge failed to consider any alternatives to the one proposed by the state simply because he did not discuss others in open court. *Waller* counsels trial courts to consider alternatives to a complete closure of a public proceeding. But, it is not unreasonable to conclude that *Waller* does not require a trial court, faced with minimal, indeed perfunctory, opposition to a request that a courtroom be temporarily closed in a child sex abuse case while the victim testifies, to invent and reject alternatives to the proposed closure. *See, e.g., Ayala,* 131 F.3d at 71 (finding "nothing in the First Amendment cases or in *Waller* to indicate that once a trial judge has determined that limited closure [to protect a single witness during his testimony] is warranted as an alternative to complete closure, the judge must *sua sponte* consider further alternatives to the alternative deemed appropriate").

In this case, the closure under consideration extended only to the testimony of a single witness for her protection, and it

---

12. Bell now asserts that possible alternatives included excluding only certain people, or allowing the press to remain, or using a screen or privacy device to block Wendy's view of the audience, or using a closed-circuit television. We find these post hoc suggestions unpersuasive at best. Bell did not propose these or any other alternatives prior to the closure. Even now he does not specify what limitations on the exclusions could have been employed. It is far from clear that the press was ever excluded. And, the latter two alternatives would have failed to serve the purpose of carrying out the closure in a discreet manner and, of course, raise the different issue of Bell's right to confront his accuser.

would be utterly pointless to require the trial judge to conjure up alternative methods of protecting the witness only to reject his own proposals. Obviously, the trial judge is not in a superior position to suggest alternatives which may be more acceptable to the defendant and his counsel. We certainly cannot conclude that North Carolina was unreasonable in its adjudication of Bell's claim on this basis.

### D.

Finally, in determining whether the defendant's Sixth Amendment right to a public trial has been violated, *Waller* requires that the trial court "make findings adequate to support the closure." *Waller*, 467 U.S. at 48, 104 S.Ct. 2210. Bell contends that inadequate findings were made to support the trial judge's closure of the courtroom during Wendy's testimony and, in particular, asserts that, because the trial judge did not articulate explicit, detailed findings about Wendy's maturity, understanding, and willingness to testify, one must also conclude that the trial judge did not make an individualized determination of the need to close the courtroom in Wendy's case and instead applied a *per se* rule of closure of the type condemned in *Globe*. *See Globe*, 457 U.S. at 609, 102 S.Ct. 2613 (holding that, although the mandatory courtroom closure statute violated the First Amendment, closure of the courtroom while a child victim of sexual abuse testifies will be appropriate provided the trial judge "determine[s] on a case-by-case basis [that] the State's legitimate concern. for the well-being of the minor victim necessitates closure"); *Waller*, 467 U.S. at 45, 104 S.Ct. 2210 ("The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." (internal quotation marks omitted)). Like the district court, we believe it reasonable to conclude that the temporary closure of Bell's trial did not run afoul of

the decision in *Globe* or otherwise fall short of *Waller*'s findings requirement.

In this case, before ruling on the motion to close the courtroom, the trial judge was aware of the nature of the charges against Bell, including the extraordinary number of counts and the span of time over which they were committed, the age of the victim, and the defendant's familial relationship to the victim. The judge was aware that Bell had been indicted for over eighty counts of sexual misconduct, including multiple counts for first degree statutory rape of a minor under the age of thirteen, second degree rape, and taking indecent liberties with a minor. During a pre-trial hearing, conducted while the state's motion for temporary closure was pending, the judge had the opportunity to become familiar with the heinous nature of the alleged crimes, the child's long silence, and her forecasted testimony, as well as the opportunity to observe the minor witness and Bell in the courtroom. Specifically, the judge was made aware that the case involved the alleged sexual molestation of three minor children, and that the principal victim had been abused over the course of a two-year period, beginning when she was twelve, by her fifty-eight-year-old step-grandfather. The judge was aware that Bell's victims were friends with one another, neighbors of Bell and his wife, and that on at least one occasion, one of the girls was present at Bell's home while Wendy was being molested. The judge had also been provided, in the context of the state's motion to consolidate the offenses, with a summary of when and how the abuse occurred, including the repeated sexual abuse of both Wendy and Toni. In addition, the trial judge was aware that Wendy had kept quiet about the abuse from the time that she was twelve years old until, two years later, she and Vicki were prompted to come forward by the television show on child molestation and rape. Also, when the courtroom was closed, the trial judge was aware that Wendy's performance at school was lagging significantly.

With this knowledge, the trial judge, noting that the testimony would be "of an apparent delicate nature," J.A. 281, agreed with the state's request for a temporary closure of the courtroom while Wendy testified, but ruled that the closure would be carried out as discreetly as possible so as not to call it to the jury's attention. He did so over what could only be characterized as a perfunctory Sixth Amendment public trial objection, offered without argument or alternatives. Nor, for that matter, did counsel object to the lack of findings at the time.

First, we are unpersuaded by Bell's claim that, because the trial judge did not articulate explicit, detailed findings about Wendy's maturity, understanding, and willingness to testify, one must conclude that the trial judge did not make an individualized determination of the need to close the courtroom in Wendy's case, applying instead a mandatory or *per se* rule of closure of the type condemned in *Globe*. When the trial judge granted the state's motion for a temporary closure, North Carolina state law provided that "[i]n the trial of cases for rape or sex offense . . . , the trial judge *may*, during the taking of the testimony of the prosecutrix, exclude from the courtroom all persons except the officers of the court, the defendant and those engaged in the trial of the case." N.C. Gen.Stat. § 15–166 (1999) (emphasis added). Hence, unlike the statute in *Globe*, North Carolina imposed no mandatory rule of closure. Rather, the trial judge was vested with the discretion to evaluate, on a case-by-case basis, the propriety of a temporary closure. *See also Globe*, 457 U.S. at 608 n. 22, 102 S.Ct. 2613 (noting that the Court "intimate[d] no view regarding the constitutionality of . . . state statutes," including specifically N.C. Gen. Stat. § 15–166, which allow a trial judge to close a criminal sex-offense trial during the testimony of a minor victim, but do not mandate closure).[13]

Additionally, although *Globe* sets forth factors that a trial judge should consider when determining the propriety of closing a courtroom during the testimony of a minor victim of a sex crime, such as "the minor victim's age, psychological maturity and understanding, the nature of the crime, the desires of the victim, and the interests of parents and relatives," *id.* at 608, 102 S.Ct. 2613 (footnote omitted), the Court did not prescribe any that were determinative and, in fact, also recognized that trial judges would necessarily need to "exercise [their] discretion" in weighing these factors, as well as others not yet defined, *id.* at 609, 102 S.Ct. 2613. We find no basis upon which to conclude that the trial judge failed to carefully consider the individual facts of this case before making his decision, or that he otherwise shirked his duty in this regard. On the contrary, the record reveals that he possessed a great deal of information concerning the case before him, and certainly knowledge sufficient to exercise the discretion afforded him under both federal and

---

13. The dissent seeks to rely upon an affidavit of the state trial judge, addressing the courtroom closure, as an indication that the trial judge did not carefully consider the decision to close the courtroom at the time that it was done. In the affidavit, and in a similar written memorandum, the trial judge in fact confirms that which is obvious from the record: He had reviewed the indictments, was aware of the unusually vile nature of this child molestation case, observed the defendant and the child before him, and made the discretionary decision that "partial closure of the courtroom was necessary to enable the minor child victim to testify freely and to minimize potential embarrassment and emotional harm to the child from having to recount details of unnatural sexual activity committed on her person by an adult." J.A. 168. However, because the affidavit and memorandum were issued by the state trial court after the state court ruled upon Bell's MAR, and were submitted for the first time on federal habeas review by the state in support of its motion for summary judgment, we did not reference or rely upon them. *See e.g., Wilson v. Moore*, 178 F.3d 266, 272–73 (4th Cir.), *cert. denied*, 528 U.S. 880, 120 S.Ct. 191, 145 L.Ed.2d 160 (1999) (federal habeas courts may not take into account new evidence not presented to the state court).

state law. The graphic nature of Wendy's ultimate testimony only serves to bolster the obvious conclusion that the trial judge followed an acceptable course in temporarily closing the courtroom. And, although perhaps understated, he was certainly correct when he concluded that the delicate nature of the testimony was "apparent."[14]

Second, we cannot say that the trial court's findings, although limited, otherwise ran afoul of *Waller*'s requirement that the trial court make "findings adequate to support the closure." *Waller*, 467 U.S. at 48, 104 S.Ct. 2210. This requirement stems directly from the Court's previous holding, in *Press Enterprise I*, that the overriding interest " 'be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.' " *Waller*, 467 U.S. at 45, 104 S.Ct. 2210 (quoting *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. 819). We are satisfied that we can make the requisite determination and that the North Carolina court could as well.

As an initial premise, we note that the *Waller* Court prescribed no particular format to which a trial judge must adhere to satisfy the findings requirement, and we

read nothing in *Waller* that would require a reviewing court to evaluate the trial judge's closure order *solely* on the basis of the explicit factual findings and, thereby, ignore facts of record which fully support the decision and belie a claim that Bell's right to a public trial was actually violated by the closure. We also reject Bell's urging that we should attribute no significance to the fact that *Waller*, unlike *Globe*, does not address a temporary closure of courtroom proceedings during the testimony of a child victim of sexual abuse.[15] Nor do the other controlling Supreme Court cases, which have considered "closure" challenges brought by the press pursuant to the First Amendment where the defendant has requested closure in order to protect the right to a fair and impartial trial. *See Press–Enterprise I*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629; *Press–Enterprise II*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1. In a case involving long-standing sexual abuse of a minor by a family member, when the trial judge has obviously made a particularized determination that closure is appropriate and has articulated the basic rationale for closing the courtroom, additional "findings" would be little more that a statement of the obvious.[16] And, we certainly cannot say

**14.** Given its graphic nature, we see no purpose in discussing the precise testimony in more detail, which would seem to serve the same type of prurient interests that the closure was intended to avoid. Suffice it to say that Wendy was called upon to discuss in detail the method of Bell's indecent touchings and ultimate rape of her, by both vaginal and anal intercourse, beginning when she was twelve years old and continuing for two years. We also note that we summarily reject any reliance by Bell upon the fact that Wendy, who was sixteen years old at trial, answered the questions directed to her on the witness stand, including those of a distressing nature. Of course, it was necessary for Wendy to do so in order for the state to convict Bell. But the transcript certainly does not indicate that Wendy did so stress-free.

**15.** In *Waller*, the Court addressed the propriety of the complete closure of a seven-day hearing, held to address the admissibility of wiretap and other evidence in a proceeding

brought under the Georgia Racketeer Influenced and Corrupt Organizations Act and other commercial gambling statutes. Although the stated basis for the closure was to protect the privacy of non-parties and the admissibility of the evidence under state law, the evidence sought to be protected comprised less than two and one-half hours of tape and the state was not specific as to whose privacy interests might be infringed. Thus, the trial judge's findings were deemed too broad and general to justify a complete closure of the hearing. *See* 467 U.S. at 48–49, 104 S.Ct. 2210.

**16.** In *Press–Enterprise I*, the Court vacated the state court's decision to deny the press a copy of the transcript of jury voir dire in a highly publicized case, where the voir dire lasted six weeks and the court made no findings beyond concluding that disclosure would threaten the juror's privacy interests and the defendant's Sixth Amendment right to a fair and impartial

that it would be unreasonable for a court or defendant's counsel to conclude that there was no public trial violation based upon the absence of more detailed findings. *See United States v. Osborne*, 68 F.3d 94, 99 (5th Cir.1995) (upholding trial court's partial closure of the courtroom while a twelve-year-old victim of sexual assault testified because, despite the paucity of the trial court's explicit findings, the court was able to "infer that [the trial court] eventually ordered the partial closure" to protect the young victim from the trauma and intimidation that her public testimony would produce); *United States v. Farmer*, 32 F.3d 369, 371 (8th Cir.1994) (rejecting defendant's Sixth Amendment public trial challenge based upon the trial court's temporary exclusion, during defendant's trial for aggravated sexual abuse and kidnaping, of all spectators other than the members of the victim's family during a portion of a seventeen-year-old victim's testimony because "specific findings by the district court are not necessary if we can glean sufficient support for a partial temporary closure from the record"); *see also Brown v. Kuhlmann*, 142 F.3d 529, 538 (2d Cir.1998) (refusing to grant habeas relief for an alleged Sixth Amendment public trial violation, holding that even where the reasons given are "neither entirely accurate nor particularly compelling, the strength of the judge's findings must be evaluated by reference to the very limited scope of the closure that they support [and that] by that standard, the trial court's findings were adequate"); *Woods v. Kuhlmann*, 977 F.2d 74, 77–78 (2d Cir. 1992) (holding that, despite the lack of specific findings of fact, when the "information gleaned [from the record] . . . [was] sufficient to support the partial, temporary closure of petitioner's trial," the fourth *Waller* factor was satisfied); *but see Davis v. Reynolds*, 890 F.2d 1105, 1112 (10th Cir.1989) (holding that defendant's

---

trial. As in *Waller*, the Court also found it significant that the six-week closure "was not limited to information that was actually sensitive and deserving of privacy protection." 464 U.S. at 513, 104 S.Ct. 819. Similarly, in *Press–Enterprise II*, the Court reversed the state court's wholesale denial of the transcript of a forty-one day preliminary hearing when the state court did not demonstrate that an open proceeding would result in unfair, one-sided publicity which would prejudice the defendant's right to a fair and impartial trial. The Court held that such "preliminary hearings . . . cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest' "; specifically, that "there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent" and that "reasonable alternatives to closure cannot adequately protect the defendant's fair trial rights." 478 U.S. at 14–15, 106 S.Ct. 2735 (quoting *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. 819).

Our circuit, also in the context of First Amendment challenges to courtroom closures, has reiterated the requirement of findings set forth in *Press–Enterprise I* and *Press–Enterprise II*. Yet, they too involved First Amendment challenges to courtroom closures in cases where the overriding interests and reasons justifying the closure were not immediately apparent. In our latest opinion, *In re South Carolina Press Association*, 946 F.2d 1037, 1044 (4th Cir.1991), we upheld the complete exclusion of the media from *in camera* voir dire in a case involving extortion charges brought against state legislators, holding that the defendants' right to a fair trial outweighed the media's right to disclose information in the already highly publicized proceeding. Earlier, in *In re Charlotte Observer*, 882 F.2d 850, 854–55 (4th Cir.1989), we held that the complete closure of a change of venue hearing—in federal mail and wire fraud prosecutions arising from the PTL religious organization—violated the First Amendment rights of the press and public because on *de novo* review this court was *not* convinced that the defendants' right to a fair trial would be prejudiced by publicity, or that closure in the already highly publicized case would prevent such prejudice. And, in *In re Knight Publishing Company*, 743 F.2d 231, 234–35 (4th Cir.1984), we held that the complete courtroom closure and order sealing certain records and excising others in the criminal prosecution of a North Carolina state senator violated the First Amendment. The district judge made no findings to support the closure and considered no alternatives that would better satisfy conflicting interests between the defendant's right to a fair trial and the First Amendment rights of the press. *Id.*

right to a public trial was violated in a case involving a minor sex crime victim, in part because the trial judge made no "specific, reviewable findings adequate to support the general closure").[17]

In summary, although the better course would have been for the trial judge to make detailed findings, the findings made, viewed in conjunction with the known circumstances of the case and the record developed, provide a sufficient basis for reviewing courts (the state court, the district court, and this court) to assess the propriety of the closure. Clearly established Supreme Court precedent governing courtroom closures does not require appellate courts to review closure orders in isolation of the record, nor does it mandate

a conclusion that Bell's public trial right was violated simply because the trial judge failed to recite exhaustively every fact and inference which justified the obvious.[18] Under the circumstances of this case, we are satisfied that the record and factual findings underlying the state trial judge's decision to close the courtroom during Wendy's testimony are sufficient for us to determine that the closure order was properly entered and that this was not a situation where the purposes behind the public trial guarantee were in jeopardy. Bell was not subjected to "secret proceedings" or to the "persecution" sought to be prevented by the public trial guarantee. *See Waller*, 467 U.S. at 46 n. 4, 104 S.Ct. 2210; *In re*

**17.** The dissent asserts that we have run afoul of the Supreme Court's rejection of our holding in *Green* that state courts unreasonably apply clearly established federal law only when they interpret or apply such law " 'in a manner that reasonable jurists would all agree is unreasonable,' " *Williams*, 120 S.Ct. at 1521 (quoting *Green*, 143 F.3d at 870), by citing decisions from other circuit courts of appeal. We find the assertion that we have improperly relied upon supportive circuit court jurisprudence in evaluating the objective reasonableness of the state court decision to be surprising, given that the dissent has relied upon arguably contrary circuit court jurisprudence to reach a contrary conclusion. However, we are satisfied that *Williams* does not act as an absolute prohibition against our use, or the dissent's use, of circuit precedent.

Habeas relief under the "unreasonable application" provision of § 2254(d)(1) requires that we find the state court decision to be objectively reasonable in light of Supreme Court jurisprudence, not circuit court jurisprudence. *See Williams*, 120 S.Ct. at 1523. And, in rejecting the "reasonable jurists" standard as being too subjective, the *Williams* Court made it clear that federal habeas courts may not base the reasonableness decision "on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state did in the habeas petitioner's case." *Id.* at 1522. However, the *Williams* decision did not "suggest[ ] or command[ ] that this court make [the reasonableness] determination in a vacuum." *Vick v. Williams*, 233 F.3d 213, 222 (4th Cir. 2000). "Where ... the otherwise objectively reasonable bases for a state court's interpretation of a given precedent are common to the

reasoned decisions of many courts, it would be judicial myopia of the first order to ignore the force of consensus in assessing the objective reasonableness in the particular case." *Id.*

**18.** This court has also declined, in the context of a § 2254 petition, to place such undue emphasis on explicit findings made by a state trial court when the facts of record supported the trial court's challenged ruling. *See Fields v. Murray*, 49 F.3d 1024, 1036–37 (4th Cir. 1995) (*en banc* ). In *Fields*, we rejected a state court defendant's allegation that his Sixth Amendment right to self-representation had been violated by the trial judge's refusal to allow him to personally cross-examine minor victims of his alleged sexual abuse. Noting that the state's interest in protecting child abuse victims from emotional trauma was sufficiently important to outweigh the defendant's right to cross-examine them personally, we declined to find a Sixth Amendment violation simply because the trial court failed to make "a more elaborate finding," *id.* at 1036, to support his decision where sufficient support was present in the record:

> We think it reasonable for the trial court to have concluded on the basis of the facts before it that the[ ] eleven through thirteen-year-old girls who had experienced repeated sexual abuse would be emotionally harmed if they were personally cross-examined in open court by [the defendant], their alleged abuser. We therefore find adequate the trial court's determination that denial of this personal cross-examination was necessary to prevent emotional trauma to the girls.
>
> *Id.*

*Oliver,* 333 U.S. at 270, 68 S.Ct. 499; *cf. Lewis,* 352 F.2d at 792. We cannot conclude that the state court unreasonably rejected Bell's Sixth Amendment claims on this basis.

## IV.

Having reviewed the clearly established Supreme Court precedents which would have governed Bell's Sixth Amendment claim that he was unconstitutionally deprived of his right to a public trial—had his counsel pursued it on direct appeal to the North Carolina appellate court—we turn to the ultimate issue before us: Was North Carolina's rejection of Bell's Sixth Amendment claim that his counsel was objectively unreasonable, and therefore ineffective, for failing to pursue the public trial claim on direct appeal itself an unreasonable application of those precedents? We are satisfied that it was not.

On direct appeal, Bell's appellate counsel made the decision to pursue four out of twenty-six assignments of error. Under *Strickland,* Bell's appellate counsel was entitled to a presumption that he decided which issues were most likely to afford relief on appeal and Bell must demonstrate that counsel's decision not to pursue the public trial claim "fell below an objective standard of reasonableness" in light of the prevailing professional norms. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. For the reasons previously discussed, we cannot say that the North Carolina court unreasonably concluded, in rejecting Bell's MAR, that Bell's counsel did not act in an objectively unreasonable manner when he failed to pursue on direct appeal a claim that Bell's right to a public trial was violat-

ed by the trial court's temporary closure of the courtroom while Wendy recounted the details of Bell's repeated sexual attacks upon her.[19] Because North Carolina's determination in this regard was neither contrary to nor an unreasonable application of clearly established federal law, *see* 28 U.S.C.A. § 2254(d), we deny Bell's request for a certificate of appealability and affirm the district court's dismissal of Bell's petition for writ of habeas corpus.

*AFFIRMED.*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

The Sixth Amendment guarantees every person accused of a crime—no matter how ugly the crime or how clear the guilt—"the right to a speedy and public trial." U.S. Const. amend. VI. A public trial "ensur[es] that judge and prosecutor carry out their duties responsibly ... and discourages perjury." *Waller v. Georgia,* 467 U.S. 39, 46, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). For these reasons, as the Supreme Court has recognized, the right to a public trial is critical to "[t]he central aim of a criminal proceeding"—affording the accused a fair trial. *Id.* Accordingly, there is a strong presumption that a trial will be open to the public; a presumption that can only be "overcome" in those "rare" circumstances where "the balance of interests [has been] struck *with special care.*" *Id.* at 45, 104 S.Ct. 2210 (emphasis added). Thus, prior to closing a trial, the presiding judge must: (1) determine that the party seeking closure has advanced "an overriding interest that is likely to be prejudiced," (2) fashion a closure that is "no broader than necessary to protect that interest," (3) "consider reasonable alterna-

---

19. We are also unpersuaded by Bell's reliance upon *State v. Jenkins,* 115 N.C.App. 520, 445 S.E.2d 622, 625 (1994), decided after Bell's conviction but before his appeal, which held that the trial court erred in closing the courtroom during the testimony of an adult victim of a sexual offense without making sufficient findings in support. The facts, which involved an adult woman alleged to have been raped by her former live-in boyfriend, are distinguishable from the ones we consider today, and *Jenkins* obviously had no effect upon the state appellate court's subsequent disposition of Bell's application for post-conviction relief. Furthermore, the question before us is whether North Carolina's rejection of Bell's claim is unreasonable in light of Supreme Court precedent, not whether the state court properly applied its own precedent.

tives to closing the proceeding," and (4) "make findings adequate to support the closure." *Id.* at 48, 104 S.Ct. 2210.

When Ernest Sutton Bell was tried in Pritt County North Carolina Superior Court in January 1994, the presiding judge removed the public and press from the courtroom during the entire testimony of the most critical prosecution witness [1] without making findings adequate to support such drastic action. Indeed, nothing in the record even evidences that the judge recognized *Waller* as controlling, let alone considered alternatives or took "special care" to be sure that the closure "advanced an overriding interest . . . likely to be prejudiced" and was "no broader than necessary to protect that interest."

On direct appeal, Bell's counsel failed to argue that the closure violated the Sixth Amendment right to a public trial. On state habeas review, North Carolina courts summarily, and without explanation, rejected Bell's claim that this failure to pursue the Sixth Amendment violation on appeal constituted ineffective assistance of counsel. Because I believe the state court holding was "contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court," I respectfully dissent from the majority's refusal to grant Bell's petition for a writ of habeas corpus.

## I.

A federal court may grant habeas relief only when a state's adjudication of a petitioner's claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1). On state habeas review—termed a motion for appropriate

relief in North Carolina—the state courts' adjudication of Bell's ineffective assistance of counsel claim was perfunctory, at best. The state trial judge's order stated simply: "The undersigned, having reviewed the Motion for Appropriate Relief, finds that it fails to state a claim upon which relief can be granted. It is, therefore, denied." This was followed by an Order signed by the Clerk of the North Carolina Court of Appeals that stated, "The petition filed in this cause on the 9th day of December 1996 designated 'Petition for Writ of Certiorari' is denied ."

Under circuit precedent, such "perfunctory rejection" of a claim constitutes an "adjudication" for purposes of § 2254(d)(1). *See Green v. Catoe*, 220 F.3d 220, 223 (4th Cir.2000). *See also Cardwell v. Greene*, 152 F.3d 331, 339 (4th Cir.), *cert. denied*, 525 U.S. 1037, 119 S.Ct. 587, 142 L.Ed.2d 491 (1998); *Wright v. Angelone*, 151 F.3d 151, 156–57 (4th Cir.1998). Nonetheless, as we made clear in *Cardwell* and recently reiterated in *Green:*

> [B]ecause the state court decision fails to articulate any rationale for its adverse determination of Cardwell's claim, we cannot review that court's "application of clearly established Federal law," but must independently ascertain · whether the record reveals a violation of [a constitutional right].

*Green*, 220 F.3d at 223; *Cardwell*, 152 F.3d at 339. *See also Bacon v. Lee*, 225 F.3d 470, 478 (4th Cir.2000); *Baker v. Corcoran*, 220 F.3d 276, 291 n. 14 (4th Cir.2000).

Because the North Carolina courts provided no indication of how they applied federal law to the facts of Bell's constitutional claim, we must review their decision

---

**1.** The majority notes that of the "700–plus–page trial transcript, spanning four days, approximately forty-four pages comprised the testimony of Wendy," *ante* at 156; however, two trial days and more than 400 transcript pages were devoted to jury selection, argument of counsel, and other non-evidentiary matters. Undoubtedly, Wendy's testimony, which was more than twice as long as that of any other prosecution witness, constituted the most critical evidence against Bell. Yet, over Bell's objection, the trial judge closed the courtroom during this crucial testimony, without citing any precedent or making adequate findings.

under the *Cardwell/Green* standard. Indeed, without state court analysis, we are left with no choice *but* to independently evaluate the record and determine if a constitutional violation occurred. Thus, we must (1) ascertain what law the Supreme Court has established as to the constitutional right to a public trial and effective assistance of counsel, (2) "independently ascertain whether the record reveals a violation" of these constitutional rights—i.e., whether the state court erred in denying the writ, and finally (3) determine if the state court decision—if erroneous—is also contrary to, or involves an unreasonable application of, clearly established law as determined by the Supreme Court. The majority omits completely the second part of this analysis.

### A.

Since at least 1986, eight years prior to Bell's trial, clear and abundant Supreme Court precedent established the necessity of specific findings before removing the public from a criminal trial. The Court initially addressed the right to a public trial in 1980 in the context of the First Amendment. In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 561, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (plurality opinion), the trial court closed the courtroom during a murder trial, refusing to allow the press to witness the proceedings. The question before the Supreme Court was whether the press and the general public had a First Amendment right of access to criminal trials. The Court answered this question in the affirmative, noting that "we are bound to conclude that a presumption of penness inheres in the very nature of a criminal trial under our system of justice." *Id.* at 573, 100 S.Ct. 2814.

The Court then held that the trial court violated Richmond Newspapers's First Amendment right of access to the murder trial by closing the courtroom during the proceeding, because "the trial judge made no findings to support closure.... Absent

an overriding interest *articulated in findings,* the trial of a criminal case must be open to the public." *Id.* at 580–81, 100 S.Ct. 2814 (emphasis added).

The Supreme Court again focused on the public's First Amendment right of access to criminal trials in *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). The Globe Newspaper Co. ("Globe") unsuccessfully attempted to gain access to a rape trial in which the victims were underage females. *Id.* at 599, 102 S.Ct. 2613. In denying Globe's request to gain access to the trial, the trial court cited a state statute requiring the exclusion of the press and the public during the testimony of a minor-victim of a sexual assault. *See id.* at 599, 602, 102 S.Ct. 2613. Globe objected to the mandatory closure statute, arguing that the statute violated its First Amendment right of access to criminal trials because it did not require a case-by-case determination of whether the press should be excluded.

The Supreme Court agreed, noting that "the circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one." *Id.* at 606, 102 S.Ct. 2613. The Court held that a mandatory closure rule "cannot be viewed as a narrowly tailored means of accommodating the State's asserted interest." *Id.* at 609, 102 S.Ct. 2613. Instead, whether a trial court should close the courtroom must be analyzed on a case-by-case basis in which the trial court weighs "the minor victim's age, psychological maturity and understanding, the nature of the crime, the desires of the victim, and the interests of parents and relatives." *Id.* at 608, 102 S.Ct. 2613 (footnote omitted).

Four years later, in 1986, the Supreme Court specifically addressed *a criminal defendant's* Sixth Amendment right to a public trial. *See Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). In *Waller,* the trial court, over the defendant's objection, closed the court-

room during a hearing on a motion to suppress in a criminal case. *See id.* at 42, 104 S.Ct. 2210. The Court considered whether the trial court's closure of the courtroom violated the defendant's Sixth Amendment right to a public trial. Acknowledging that its prior precedents concerned the right to a public trial under the First Amendment, the Court nonetheless held "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Id.* at 46, 104 S.Ct. 2210. The Court thus adopted the following standard for closing a courtroom: "the party seeking to close the hearing *must* advance an overriding interest that is likely to be prejudiced, the closure *must* be no broader than necessary to protect that interest, the trial court *must* consider reasonable alternatives to closing the proceeding, and it *must make findings* adequate to support the closure." *Id.* at 48, 104 S.Ct. 2210 (emphasis added). Moreover, the findings supporting closure cannot be "broad and general," *id.;* rather, the state's interest in closing the courtroom must be "articulated along with *findings specific enough that a reviewing court can determine whether the closure order was properly entered." Id.* at 45, 104 S.Ct. 2210 (quoting *Press–Enterprise Co. v. Superior Court of California,* 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)) (emphasis added).

Thus, of particular relevance here, well prior to Bell's 1994 trial, Supreme Court precedent—*Globe, Waller, Richmond Newspapers,* and *Press–Enterprise*—clearly established that: (1) a trial court cannot close the courtroom to the public during a criminal trial without specific, on-the-record findings supporting closure; and (2) a trial court may not enforce a *per se* rule mandating closure of a courtroom simply because the witness is a minor-victim of a sexual assault.

**B.**

It is clear under Supreme Court precedent that the removal of the public from the courtroom without specific findings supporting the decision violated Bell's Sixth Amendment right to a public trial. As such, the failure of Bell's appellate counsel to raise this claim constituted ineffective assistance.

**1.**

The following colloquy represents the only analysis conducted by the state trial court before closing the courtroom:

PROSECUTOR: And Judge, we have an outstanding motion I forgot to bring up earlier that the State had about closing the courtroom when at least Wendy testifies or all of the children testify at the appropriate time.

THE COURT: Is there any objection to that motion?

BELL'S COUNSEL: Yes, sir, we would object to closing the courtroom. *We believe that would impact on our client's constitutional right to a public trial. We would oppose it.*

THE COURT: Well—

PROSECUTOR: I would argue that that is *contrary to case law in this state.*

THE COURT: The Court is going to allow that motion and we'll do it in the most discreet way possible so that the jury doesn't even notice it unless someone else calls it to their attention. We can take a short recess, and I can excuse the jury and I can tell the others—other people in the courtroom that this is testimony of an apparent delicate nature. *I don't see anything wrong with that.* I am going to allow that motion.

J.A. 280–81 (emphasis added).

The trial court made no findings to support closure of the courtroom.[2] The

---

**2.** As noted above, because the presiding judge failed to make adequate findings, nothing in

the record demonstrates that he considered,

court's conclusory statement that the testimony was of an "apparent delicate nature" obviously does not constitute "findings" that are "specific enough that a reviewing court can determine whether the closure order was properly entered." *Waller*, 467 U.S. at 45, 104 S.Ct. 2210 (quoting *Press–Enterprise*, 464 U.S. at 510, 104 S.Ct. 819). The trial judge failed even to acknowledge defense counsel's assertion that closing the courtroom would impact Bell's constitutional right to a public trial. Indeed, the judge stated that he "didn't see anything wrong with" clearing the courtroom without ever asking the witness if an open courtroom would inhibit her testimony, thus failing the first *Waller* requirement. He did not ask whether she feared for her safety, *see, e.g., Woods v. Kuhlmann,* 977 F.2d 74, 77 (2d. Cir.1992) (upholding closure because the judge questioned the witness to determine if fears of specific threats were credible), or whether she felt so intimidated as to warrant the drastic action of banning the public, *see, e.g., Guzman v. Scully,* 80 F.3d 772, 775–76 (finding a public trial violation because the judge never asked the witness whether she felt intimidated, or whether any intimidation was sufficient to overcome the presumption of an open trial).

Without knowing if a witness is threatened or intimidated, and if so, why, it is impossible to determine whether the threat or intimidation is so drastic as to warrant closure or whether removing the public would even cure the problem. For instance, if Wendy had indicated that Bell's presence intimidated her, removing the public would not have alleviated that intimidation. The judge's lack of inquiry falls far below the "special care" required to overcome the presumption that court proceedings should be open to the public.

In fact, it is hard to imagine that a court could grant a motion to close a courtroom in a more perfunctory manner. Indeed:

The trial court's order excluding the public from the witness' testimony, without any inquiry or findings concerning the specific condition of the witness in this case, is essentially equivalent to the blanket legislative closure rejected in *Globe Newspaper*.

*Davis v. Reynolds,* 890 F.2d 1105, 1111 (10th Cir.1989).

The trial judge also failed to consider reasonable alternatives to excluding the public and press from the courtroom. *Waller,* 467 U.S. at 48, 104 S.Ct. 2210. This is unsurprising, however, because it is difficult to consider alternatives to solve a yet-to-be determined problem. Moreover, the trial judge's "solution" was certainly "broader than necessary" to protect any possible interest that could have been articulated by Wendy, *id.,* because the judge not only cleared the courtroom during Wendy's testimony, but also closed the courtroom prior to opening statements.[3]

As a result, contrary to established Supreme Court precedent, the state trial court violated Bell's Sixth Amendment right to a public trial by closing the courtroom without making the necessary findings.

### 2.

Because Bell's right to a public trial was so clearly violated, it is equally clear that appellate counsel's failure to raise the public trial issue on appeal rendered his assistance constitutionally ineffective. The right to the effective assistance of counsel extends to a criminal defendant's first appeal as of right. *See Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

An ineffective assistance of counsel claim usually has two elements: counsel's performance must have fallen "below an objective standard of reasonableness," *see Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),

---

let alone correctly applied, the other *Waller* factors.

3. There is no indication that the public or press ever re-entered the courtroom.

and there must be a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. However, as the majority properly recognizes, when, as here, the deficient performance constitutes structural error "the prejudice component of the *Strickland* analysis may be presumed." *Ante* at 165, (citing *McGurk v. Stenberg,* 163 F.3d 470, 473–74 (8th Cir.1998)). *See also Neder v. United States,* 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). Thus, if appellate counsel's failure to pursue Bell's right to a public trial fell below an objective standard of reasonableness, prejudice is presumed and the representation must be held constitutionally ineffective.

Of course, appellate counsel does not have a duty to raise every nonfrivolous argument on appeal, *see Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), but "a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994). When appellate counsel fails to raise issues that are "clearly stronger than those presented," the presumption that counsel rendered effective assistance will be overcome. *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1985).

As demonstrated within, well prior to Bell's 1994 trial, Supreme Court precedent required that trial courts express on-the-record findings before closing a courtroom. Moreover, this is not a case where trial counsel failed to object and appellate counsel was required to plumb the record to find the unconstitutional closure and contend that the closure constituted plain error. Here, Bell's trial counsel did properly object to this clear constitutional violation, and yet appellate counsel still did not find this issue important enough to brief. Instead, appellate counsel chose to assert evidentiary challenges that had no likelihood of success. Appellate counsel's fail-

ure to raise the one issue that would have been a "dead-bang winner" renders his assistance constitutionally ineffective. *See Banks v. Reynolds,* 54 F.3d 1508, 1515 (10th Cir.1995) ("[A]n appellate advocate may deliver deficient performance and prejudice a defendant by omitting a 'dead-bang winner,' even though counsel may have presented strong but unsuccessful claims on appeal.") (quoting *United States v. Cook,* 45 F.3d 388, 394–95 (10th Cir. 1995)); *see also Fagan v. Washington,* 942 F.2d 1155, 1157 (7th Cir.1991) ("His lawyer failed to raise either [meritorious] claim, instead raising weaker claims.... No tactical reason—no reason other than oversight or incompetence—has been or can be assigned for the lawyer's failure to raise the only substantial claims that [defendant] had.").

In sum, controlling Supreme Court precedent establishes that Bell's right to a public trial was violated and that appellate counsel's failure to raise this claim constituted ineffective assistance of counsel.

### C.

The only remaining question is whether the North Carolina courts' clearly incorrect rejection of Bell's ineffective assistance of counsel claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C.A. § 2254(d)(1).

The Supreme Court has instructed that a state court decision is "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," if the state court "arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law," *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). A state court decision involves an unreasonable application of clearly established federal law if the state court "identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreason-

ably applies that principle to the facts of the prisoner's case." *Id.*

In this case, of course, we simply do not know what governing legal principles (if any) formed the basis of the state courts' rejection of Bell's ineffective assistance claim. We do not know why they concluded that closure of Bell's trial during the testimony of the most crucial prosecution witness, without any indication that the required *Waller* factors had even been considered, let alone correctly analyzed, did not constitute obvious reversible error that should have been raised by any competent appellate counsel. The North Carolina courts did not provide any reasoning or cite a single legal principle or precedent, let alone Supreme Court precedent, in support of their decision.

The record suggests that the North Carolina courts most likely followed legal principles directly contrary to those mandated by the Supreme Court. In opposing Bell's objection to closure at trial, the State asserted that refusal to grant the closure would be "contrary to case law in this state." Similarly, when opposing Bell's petition for state habeas relief, the State relied heavily on *State v. Burney,* 302 N.C. 529, 537, 276 S.E.2d 693, 698 (1981), a pre-*Waller* case in which the state court concluded that the defendant could not "fashion support for a sixth amendment claim from a case which has manifest first amendment underpinnings" and in any event, any error in closing the proceedings was "harmless." If the state courts based their decision on either or both of these rationales, then certainly their decisions are contrary to "clearly established Federal law, as determined by the Supreme Court." 28 U.S.C.A. § 2254; *see Williams,* 120 S.Ct. at 1523. This is so because both of these rationales are dia-

metrically opposite to the conclusions reached by the Supreme Court in *Waller.*[4]

Of course, although it seems unlikely, the state habeas courts may have "identified the correct governing legal principles" from controlling Supreme Court precedent (*Waller, Globe, Richmond Newspapers,* and *Press–Enterprise*) and concluded that the state trial court had complied with those principles. This seems improbable in view of the fact that the State never argued on state habeas review that the trial court's closure accorded with *Waller, Globe, Richmond Newspapers, Press–Enterprise,* or other Supreme Court precedent. If the state habeas courts had chosen to rely on an argument never made by the state, it seems likely that they would have thought the issue worth more than a perfunctory denial. But assuming—even though there is no evidence this occurred—that the state habeas courts did identify the correct governing legal principles, I believe that their denial of Bell's habeas petition was an "unreasonable application of, clearly established Federal law, as determined by the Supreme Court."

I recognize that not every incorrect decision is unreasonable, *see Williams,* 120 S.Ct. at 1522, and that a federal habeas court cannot simply substitute its own judgment for that of the state court. Rather, in a "close" case, we must uphold the state court decision even if we disagree with the outcome. *See Tucker v. Catoe,* 221 F.3d 600, 614 (4th Cir.2000) (denying habeas on a "close issue" even though the state court was incorrect). *See also Francis v. Stone,* 221 F.3d 100, 113 (2d Cir. 2000) (upholding state court habeas denial because it was a "close question," even though state court might well have been wrong).

---

4. In *Waller* the Court expressly held "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public," 467 U.S. at 46, 104 S.Ct. 2210, and that "the defendant should not be required to

prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee," thus, "the harmless error rule is no way to gauge the great, though intangible, societal loss that flows from closing courthouse doors." *Id.* at 49, 50 & n. 9, 104 S.Ct. 2210 (internal quotation marks omitted).

But just as surely, when a state court fails to provide any rationale for its decision, and when our mandated independent review of the record reveals that the constitutional violation was *not* a close question, it is our duty to correct an unreasonable application of Supreme Court precedent. For example, in *Delgado v. Lewis*, the Ninth Circuit's examination of a state court denial of habeas was "impeded ... because no rationale for [the state court's] conclusion was supplied." 223 F.3d 976, 981 (9th Cir.2000). The federal court reversed the state court decision because it had "a *definite and firm conviction* that an error ha[d] been committed." *Id.* (quoting *Van Tran v. Lindsey*, 212 F.3d 1143, 1153 (9th Cir.2000)) (emphasis added).

The constitutional ineffectiveness of Bell's appellate counsel is not a close issue. There was "no semblance of a tactical reason" for not pursuing Bell's public trial claim. *Washington v. Smith*, 219 F.3d 620, 630 (7th Cir.2000). Bell's counsel raised four arguments on appeal, none of which possessed the obvious strength of the public trial violation. Indeed, disputing a judge's evidentiary discretion rather than appealing his complete disregard for the mandates of the Supreme Court on a matter of constitutional law is hardly the action of reasonable counsel. Because the constitutional violation was clear, the state courts' summary dismissal of Bell's habeas petition was an "objectively unreasonable" application of federal law.

## II.

I find puzzling and unconvincing the majority's holding that North Carolina's rejection of Bell's claim was not objectively unreasonable.

## A.

Puzzling, because the majority never attempts an essential part of the analysis, i.e., an independent determination of whether Bell's appellate counsel was in fact constitutionally ineffective. *See Green*, 220 F.3d at 223; *Cardwell*, 152 F.3d at 339. Instead, the majority simply cites *Strickland* and concludes that the state courts' denial of Bell's ineffective assistance claim was "neither contrary to nor an unreasonable application of clearly established federal law." *Ante* at 175. The majority engages in no independent determination of whether the state courts erred; only a conclusion that if there was error, it was not unreasonable. This directly contradicts the *Cardwell/Green* mandate that we "independently ascertain whether the record reveals a violation of [a constitutional right]." *Green*, 220 F.3d at 223; *Cardwell*, 152 F.3d at 339.

The majority does not contend to the contrary. Rather, in response to my suggestion that it has failed to follow recent, directly controlling circuit precedent, the majority simply overrules that precedent.[5] Although I recognize that the en banc court can create and destroy circuit precedent as it chooses, I believe that the majority's action today is unwise. There is no reason, except expediency, to reject the well-established practice of this court—followed by all of our active judges, including every member of today's majority-of making an independent determination of whether a constitutional violation has occurred when evaluating whether a summary state court decision "involved an unreasonable application" of federal law under § 2254(d). *See Goins*

---

5. I agree with the majority that the language in *Cardwell* seemingly requiring *de novo* review cannot be reconciled with the AEDPA. Of course, this does not in any way require disavowal of our well-established practice of initially making an independent determination as to whether a state court decision was erroneous. Indeed, in *Barnabei v. Angelone*,

214 F.3d 463 (4th Cir.2000), we recognized that although "de novo review by a federal habeas court remains inappropriate under § 2254(d)," a summary state court adjudication forces us to "independently ascertain whether the record reveals a violation." *Id.* at 477 (internal quotations omitted).

*v. Angelone*, 226 F.3d 312, 324 (4th Cir. 2000) (finding that the state court "correctly rejected th[e] claim and, by definition, its conclusion was not unreasonable"); *Bacon v. Lee*, 225 F.3d 470, 479 (4th Cir.2000) (concluding that counsel was not ineffective and thus the state court habeas denial was not "unreasonable" under § 2254(d)); *Tucker v. Catoe*, 221 F.3d 600, 614 (4th Cir.2000) (finding error, but nonetheless concluding that the state court was not unreasonable); *Barnabei*, 214 F.3d at 469 (discussed *infra* at n. 5); *Baker v. Corcoran*, 220 F.3d 276, 293 (4th Cir.2000) (concluding that a jury instruction was correct and an ineffective assistance claim was without merit, and thus the state habeas court did not unreasonably apply federal law in denying the writ); *Cardwell*, 152 F.3d at 339.

Indeed, the Supreme Court has twice recently indicated that our well-established practice is proper. In *Williams*, while not addressing this exact question, the Court's language suggests that ours is the appropriate methodology. The Court instructed:

> Under 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ *simply* because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must *also* be unreasonable.

*Williams*, 120 S.Ct. at 1522 (emphasis added). The *Williams* Court thus recognized the appropriateness of federal habeas courts independently analyzing asserted claims as long as they "also" engage in the AEDPA reasonableness determination. Moreover, just last term the Supreme Court itself addressed an AEDPA claim by *first* evaluating whether the state court decision was erroneous, and only after concluding that it was not, holding that the state court had not unreasonably applied federal law. *Weeks v. Angelone*, 528 U.S. 225, 120 S.Ct. 727, 734, 145 L.Ed.2d 727 (2000). *See also Van Tran*, 212 F.3d at 1155 (requiring federal courts to first determine whether the state court's decision was erroneous because it "promotes clarity in our own constitutional jurisprudence and also provides guidance for state courts, which can look to our decisions for their persuasive value.")[6]

Under the AEDPA, federal courts have no business reversing even perfunctory state habeas decisions that are "close" to the mark. *See Tucker*, 221 F.3d at 614. A federal court must, however, find the mark when the state court fails to do so by issuing a summary decision. At some point in the judicial process, even a person convicted of heinous crimes deserves a rigorous and complete analysis of his constitutional claims. If no state court provides such analysis, this task falls to the federal courts. A summary conclusion that a case is "close," without more, does not afford habeas petitioners a full and fair opportunity to have their habeas claims diligently considered. In many cases, issues that appear "close" at first may, in fact, show themselves as clearly wrong after an exacting review.

That is not to say that federal courts may substitute their analysis for a state

---

**6.** As the *Van Tran* Court noted, this approach is the only one consistent with the Supreme Court's recent clarification, in the analogous area of qualified immunity, that *before* a court may decide whether a state employee violated a constitutional right that was "clearly established," it "must" decide whether a constitutional right was violated in the first place. *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (holding that it is improper to dismiss a claim by simply concluding that a constitutional right was not "clearly established" without reaching the antecedent question); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[T]he better approach to resolving cases ... is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question.")

court decision. But, in the process of evaluating constitutional violations, federal habeas courts should satisfy themselves, the reviewing court, and the petitioner that a "close" issue was in fact "close," and a state court decision, no matter how cursory, was reasonable.

It seems to me that the majority's careful avoidance of the question of whether the state courts' decision was contrary to establish federal constitutional law can only be explained as at least implicit recognition that counsel's failure to appeal the blatant public trial violation clearly violated federal law. This obviously undermines the majority's conclusion that the decision was nonetheless objectively reasonable. After all, the North Carolina courts enunciated no reason for their decision and from what can be gleaned from the record this most likely was because they were unfaithful to well-established Supreme Court precedent. State courts should not be allowed to insulate their decisions by failing to express their reasoning.

## B. .

The majority attempts to obscure the clear and unreasonable ineffectiveness of Bell's appellate counsel by portraying the trial judge's courtroom closure as a "proper" decision. The majority offers two grounds for this portrayal. Neither is convincing.

First and principally, the majority constructs a new record to take the place of the missing findings. Thus, the majority recounts in some detail what the state judge was "aware of" or "made aware of" or "information" that he "possessed." *Ante* at 170–72. This may or may not be so; we simply do not know what the trial judge was aware of and what information he possessed. More importantly, we do not know how, if at all, matters of which he was "aware" or "information he possessed" figured in his decision to close the courtroom. We do not know because, contrary to clear Supreme Court precedent, the tri-

al court did not provide findings justifying the closure.

The sole source the majority provides for its suggestions as to the trial judge's "awareness" is a pretrial hearing. But, no witnesses testified at this hearing. Whatever information the trial judge gleaned from it was based entirely on the prosecutor's argument; surely a lawyer's argument does not provide a satisfactory basis for assessing guilt, or denying a public trial. Nor does an affidavit filed by the state trial judge, four years after the trial, provide a basis for the closure. Tellingly, in this affidavit, the judge merely states that he observed that Wendy was under eighteen and gives assurances that he took the embarrassment and emotional well-being of the child into account in deciding to close the courtroom. Not even in this after-the-fact statement does the judge assert that "an overriding interest likely to be prejudiced" compelled the closure he ordered or that he made "implicit" findings supporting the closure.

Even more significantly, in *Waller*, the Supreme Court expressly rejected the view that the failure to make express findings can be corrected by post hoc analysis of the record. *See Waller*, 467 U.S. at 49 n. 8, 104 S.Ct. 2210 ("The *post hoc* assertion by the Georgia Supreme Court that the trial court balanced petitioners' right to a public hearing against the privacy rights of others cannot satisfy the deficiencies in the trial court's record."). Indeed, *Waller* made it clear that trial courts must make findings "specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* at 45, 104 S.Ct. 2210. The majority's analysis turns *Waller* on its head. Under the majority's reasoning, a trial court no longer has to make specific findings so that an appellate court can properly review those findings; instead, an appellate court can now correct the errors of the trial court by relying on the trial judge's post hoc justifications or by creating its own "findings,"

albeit without considering any evidence or viewing a single witness.

The majority's post· hoc creation of a record to support the closure of a courtroom also has the effect of violating the Supreme Court's holding in *Globe*, which prohibited a *per se* closure of a courtroom during the testimony of a minor-victim of a sexual assault. As the trial court never personally evaluated Wendy's state of mind or inquired into why she could not testify in open court, it could only have based its decision upon the general nature of the crime alleged and the age of the witness. To base a closure decision on these general characteristics that are present in virtually all child abuse crimes is to apply a *per se* rule. A case-by-case inquiry requires the trial court to actually inquire into why a *particular* witness would encounter difficulty testifying in a public courtroom.

Requiring explicit on-the-record findings is not a meaningless formality. This requirement forces trial courts to weigh the evidence supporting and opposing closure in a systematic fashion, thereby ensuring that courtrooms are not closed after perfunctory dismissal of a defendant's Sixth Amendment rights. Under the majority's analysis, however, a trial court need not make an individualized determination that closure is necessary. Rather, the majority would allow a trial court to close the courtroom during the testimony of every minor-victim of a sexual assault without any express findings supporting closure.

The majority's other reason for finding that the state courts did not "unreasonably reject" Bell's claim is that the instant case assertedly involved only a "partial closure." *Ante* at 172–75. The majority contends that it was not unreasonable for North Carolina to fail to apply the principles so clearly articulated in Supreme Court precedent because the Supreme

Court cases involved *complete* closures of a courtroom, while the present case involves only a "partial. closure." But in fact, the Supreme Court dealt with a "partial closure" of a courtroom in *Press–Enterprise*, 464 U.S. at 503, 104 S.Ct. 819. There, three days of a six-week voir dire were open to the public, and the remainder of the proceeding was closed. *See id.* The proceeding thus was a "partial closure" under the majority's analysis. The Supreme Court nonetheless required "findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* at · 510, 104 S.Ct. 819. Accordingly, the Court held that petitioner's First Amendment right of access to a criminal trial was violated, because there had been "a failure to articulate findings with the requisite specificity." *Id.* at 513, 104 S.Ct. 819. The majority's "partial closure" distinction thus finds no support in Supreme Court precedent.[7]

The majority also attempts to buttress its "partial closure" distinction by relying on decisions from other circuits to support the notion that express findings are not always necessary when dealing with some "partial closures." *See ante* at 172–75. The majority apparently believes that North Carolina's decision cannot be "unreasonable" under the AEDPA if the decision finds some support in case law from other circuits. Such a rationale echoes reasoning specifically rejected by the Supreme Court in *Williams*. There the Court made it clear that "[t]he federal habeas court should not transform the inquiry into a subjective one by resting its determination ... on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case." *Id.* at 1521–22. Even if some circuits had held that every closure of less than an entire proceeding

---

7. While the closure in *Press–Enterprise* was more extensive than the closure in this case, it only involved the voir dire of prospective jurors while the closure here involved a far more critical portion of the trial—the testimony of the key prosecution witness, whose testimony was necessary to secure a conviction for the offenses charged.

constituted a partial closure, and that such partial closures do not need to be justified by express findings, such a holding would still be unreasonable because it directly conflicts with Supreme Court precedent, i.e. *Press–Enterprise.*[8]

Of course, no circuit has held anything of the kind. Rather, even in those cases on which the majority so heavily relies, courts have either ordered removal of only members of the defendant's family, *see United States v. Osborne,* 68 F.3d 94, 99 (5th Cir.1995) (ordering removal only of defendant's sister allowing all other spectators including other relatives of the defendant to remain in court); *Woods v. Kuhlmann,* 977 F.2d 74, 76 (2d Cir.1992) (permitting exclusion only of members of defendant's family during one witness's testimony), or required findings of, or at least some knowledge of, a specific threat to the testifying witness, in order to bar the press and public. *See Ayala v. Speckard,* 131 F.3d 62, 64–65 (2d Cir.1997) (en banc) (closure of courtroom permitted to protect security of undercover police officers after a hearing on the issue); *United States v. Farmer,* 32 F.3d 369, 372 (8th Cir.1994) (upholding closure because there was evidence in the record that the defendant had threatened the victim/witness who feared retaliation by the defendant and his family).

In contrast, Bell's trial was totally closed during the testimony of the most crucial prosecution witness; neither the public nor the press was allowed to remain to safeguard the fairness of the proceeding.[9] Moreover, the trial judge held no hearing, made no findings, questioned no witnesses,

knew of no specific threat to any witness, and based his decision on nothing more than the "apparent delicate nature" of the testimony. *See also United States v. Galloway,* 937 F.2d 542, 547 (10th Cir.1991) (in a case very similar to Bell's, reversing and remanding to district court for further findings regarding a partial closure). Consequently, it is clear that Bell's right to a public trial was violated and counsel's failure to pursue that argument on appeal was undeniably ineffective assistance.

### III.

If Ernest Sutton Bell committed the ugly crimes charged against him, he merits stern punishment. But no matter how dreadful his crimes, they do not entitle a state to deny his constitutional right to a public trial, as North Carolina did. When Bell maintained that his appellate counsel provided ineffective assistance in failing to so argue, North Carolina courts rejected his claim without explanation. That rejection was either contrary to, or involved an unreasonable application, of clearly established law as determined by the Supreme Court. Accordingly, Bell's petition for a writ of habeas corpus should be granted.

Judge MICHAEL joins this dissent.

BUTZNER, Senior Circuit Judge, dissenting:

I dissent for the reasons stated in *Bell v. Jarvis,* 198 F.3d 432 (4th Cir.1999).

---

8. To the extent that we should look beyond Supreme Court precedent under the AEDPA (and we should not), the application of Supreme Court precedent by the North Carolina Court of Appeals has substantially more probative value than decisions by other federal circuits. And the North Carolina Court of Appeals has required express, on-the-record findings before allowing a "partial closure" of a courtroom during the testimony of a victim of a sexual assault. *See State v. Jenkins,* 115 N.C.App. 520, 525, 445 S.E.2d 622, 625

(1994). *Jenkins* was governing precedent in North Carolina at the time of Bell's appeal, making it clear beyond any doubt that appellate counsel's future to raise the public trial argument was indeed the failure to raise a "dead-bang winner" and, therefore, ineffective assistance. *See Banks,* 54 F.3d at 1515.

9. The trial judge allowed the complaining witness's family to remain, but that certainly did nothing to protect *Bell's* right to a fair trial.